825 A.2d 1163 (2003)
361 N.J. Super. 403
STATE of New Jersey, Plaintiff-Respondent,
v.
Sheryl VAN DYKE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 2003.
Decided June 27, 2003.
*1164 Michael J. Rogers, Allenwood, argued the cause for appellant (McDonald & Rogers, attorneys; Mr. Rogers, of counsel and on the brief).
James L. McConnell, Assistant Prosecutor, argued the cause for respondent (Wayne J. Forrest, Somerset County Prosecutor, attorney; Mr. McConnell, of counsel and on the brief).
Before Judges SKILLMAN, CUFF and WINKELSTEIN.
The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we review two evidentiary rulings which defendant contends deprived her of a fair trial. One ruling barred defendant from access to the educational records of the young man defendant was accused of sexually assaulting. The other ruling barred admission of expert testimony regarding her psychological condition which defendant sought to introduce in support of her defense of duress. We affirm the exclusion of the expert testimony. We find, however, that the trial judge mistakenly exercised his discretion when he failed to conduct an in camera inspection of the victim's school records and release of those records to defense counsel.
Following a jury trial, defendant, Sheryl Van Dyke, was convicted of a single count of second degree sexual assault contrary to N.J.S.A. 2C:14-2c(4) and two counts of third degree endangering the welfare of a child contrary to N.J.S.A. 2C:24-4a. The primary victim, J.M., was thirteen at the time of the offense. At sentencing, the judge merged the endangering conviction involving J.M. with the sexual assault conviction and imposed a five-year term of imprisonment. On the second endangering conviction, which involved K.M., the *1165 judge imposed a concurrent three-year prison term. The appropriate penalties and assessments were imposed. In addition, defendant must register pursuant to Megan's Law, N.J.S.A. 2C:7-1 to -19, submit to DNA testing, and she is subject to community supervision for life.
In the summer of 1999, defendant was thirty-four years old and married for fifteen years. Defendant and her husband had two children, an eleven year old son and an eight year old daughter, who played frequently with thirteen year old J.M. and his twelve year old sister K.M. They were neighbors of J.M.'s family. The children spent their time swimming, watching television and playing on the computer at defendant's residence.
Defendant conceded that a sexual relationship developed between J.M. and her in September 1999. She testified that J.M. coerced her by threatening to punch her eight year old daughter, who wore a cardiac pacemaker at the time. Defendant testified that she feared that a punch would disrupt the pacemaker and trigger cardiac arrest.
J.M. testified that defendant initiated the relationship. He conceded that he physically assaulted defendant in the later stages of the relationship but contended it was a reaction to her sexually assaultive behavior. We relate both versions of the relationship.
According to J.M., about a week after his thirteenth birthday, he was at defendant's residence in the playroom watching the movie "Face Off" with defendant. Defendant came over to the sofa where J.M. was lying, laid down on top of him and started to kiss him. J.M. testified he was shocked and pushed her off him when someone came inside. J.M. went upstairs and sat at the kitchen table, and defendant also went upstairs and stared at him across the table. Nothing else happened that day.
A few weeks later, during the evening of September 16, 1999, J.M. was at defendant's residence. Defendant's husband and children were asleep upstairs. In the playroom, defendant asked J.M. if he wanted a "blow job" and proceeded to give him one. J.M. stated this was his first sexual experience. He denied cursing at defendant or making any threats toward her at that time.
At the end of September, defendant asked J.M. to help her fix the headboard on her bed. Defendant's two children and J.M.'s siblings were downstairs in the playroom. According to J.M., defendant pushed him onto the bed, took off her pants and had intercourse with him. Defendant made J.M. wear one of her husband's condoms. J.M. denied punching or using force with defendant at that time.
J.M. explained that defendant kept track of when they had sex by using color-coded dots on a calendar, with each color representing a different sexual act. J.M. claimed that he had sex with defendant four to five times a week after school. Defendant often invited his siblings to the house for sleepovers. During these sleepovers, defendant and J.M. would have sex while the other children were asleep.
J.M. testified that defendant joked about J.M. killing her husband and giving him half the insurance money. Defendant would also say "I love you," and said she wanted to marry J.M. when her husband died and J.M. turned eighteen. J.M. described underwear that defendant wore, and described defendant's Caesarean section scar. He also viewed pornographic movies with defendant.
J.M. testified that after his grandmother passed away in February 2000, he began to have feelings of anger because of what defendant was doing to him. At this point, J.M. began to fight defendant when she tried to have sex with him and was physically *1166 aggressive during other times. In one incident, defendant and J.M. argued over a bag of bagel chips, and he kicked defendant and pushed her onto the floor. J.M. took the channel changer and smashed it in defendant's face with such force that the batteries flew out; defendant sustained a black eye and a bloody nose. J.M. also admitted choking defendant during this altercation. J.M. testified that this sort of physical assault happened approximately once a month, and verbal confrontations occurred about twice a week.
J.M. used defendant's computer frequently, and had access to defendant's America Online account. He had his own screen names on defendant's account, such as "popkornpimp69" and "XXXpimp69XXX." At one point, America Online closed the account because of J.M.'s behavior on the internet. J.M. claimed defendant showed him how to access porn sites, and would use the porn sites to arouse him so they could have sex.
J.M. testified that defendant threatened to overdose on her medication, cut her wrists with a razorblade, or take her two children and move in with someone she met on the internet if he told anyone about their relationship. J.M. claims that he cut off the sexual relationship on April 10, 2000 after the bagel chips incident, because defendant expressed an interest in having a lesbian relationship with his younger sister K.M., and began to do the same things with K.M., such as talking on the phone, that defendant had done to establish a relationship with him. On May 18, 2000, J.M. told his sister K.M. and another sister that he had been having an affair with defendant and that defendant might try to have sex with K.M. He then informed his parents who took him to the police.
Defendant testified that her daughter had a pacemaker and that J.M. threatened to punch her daughter in the chest if defendant did not have sex with him. Defendant claimed that J.M. and his sisters began coming over, uninvited, to play with her children and use her computer in May 1999. She claimed J.M. was pleasant at that time, but constantly complained about his home life. In July 1999, J.M. had a bad day, and she comforted him by giving him a hug and kiss on the cheek. After this incident, J.M.'s behavior began to change; he sat close to her, put his arm around her or his head on her lap. Defendant tried to discourage this behavior by telling him to move over, but he persisted.
In August 1999, defendant claimed J.M. began to show signs of aggression towards her, such as hitting her, kicking her or spitting on her. Defendant tried to send him home after this behavior, but he would not leave. J.M. fought with defendant's son, positioned him in a choke hold, and said, "I could kill him in a second." J.M. remembered "clowning around" with defendant's son, with his hands around his neck, but denied threatening to kill him. J.M. boasted about his violent behavior at home, bragged of holding a knife to his sister's throat, and setting fire to a field and being arrested. J.M. admitted that he told defendant about these things. According to defendant, J.M. also questioned defendant repeatedly about her sex life, and J.M. hit or threatened her when she would not answer.
On September 16, 1999, defendant recalled watching TV in the playroom with J.M. Her husband was not home. Defendant claimed J.M. sat close to her on the couch and requested that she give him a blow job. When she refused, he threatened to kill defendant's daughter by punching her pacemaker. Believing J.M.'s threats, she performed oral sex on him.
Defendant described a pattern of control that J.M. attempted to establish over her. *1167 She claimed he destroyed her CDs and movies. She asserted that whenever J.M. wanted sex, he threatened to kill her daughter, her son, or her if she did not comply, and he constantly hit, kicked, punched, choked, pushed and spat on her. She claimed that a few times a month he threatened to burn her house down if she did not have sex with him. If she was on the phone, he yelled at her to get off or hung up the phone. When defendant wore makeup, J.M. questioned her; when she wore clothes he did not like, he ripped them off her. He broke down the locked door of a bathroom she used.
Defendant claimed that if she bought her children something while shopping, J.M. became angry and violent if she did not buy something for him. She claimed J.M. rearranged her wedding rings to pretend that he was married to defendant, and that he told his family and defendant's family that defendant was afraid of him because he had control over her.
Defendant claimed J.M. threw things at her, such as food, books and pillows. Defendant testified that during one incident, J.M. became angry with her and threw all of her patio furniture off the deck, smashing it. J.M. admitted this incident. Defendant presented numerous pictures which depicted property in her house defaced or damaged by J.M. He admitted doing some of the damage. He also called defendant vile names.
Defendant recounted the bagel chips incident when J.M. smashed a channel changer in her face. She added that, in addition to hitting her with a channel changer, J.M. also took off a ball chain necklace, whipped her face with it, and choked her until she nearly fainted.
Defendant claimed the bagel chips incident spurred her to break off their relationship. About a week later, J.M. and her son started fighting. J.M. choked, punched and hit him. When defendant attempted to separate the boys, J.M. punched her in the mouth and nose causing profuse bleeding.
The State produced a number of emails that were written by defendant to J.M. The emails were mostly of an explicit nature, referencing the sexual exploits of defendant and J.M. Defendant claimed she did not write all of the emails and that some were written in a style that she was unfamiliar with, such as using "U" for "you" and "R" for "are." However, she admitted sending some of the emails to J.M. because he insisted that whenever she wrote an email to her children, she should send one to him as well. In one email defendant wrote "please delete this when you're finished reading it, or you'll be visiting me in jail." The State also introduced pornographic pictures and a movie clip downloaded under defendant's screen name, and a photograph depicting J.M. with his legs around defendant and grabbing her breasts.
E.M., the mother of J.M. and K.M., testified that J.M. was a pleasant, helpful, typical twelve year old prior to August 20, 1999. After that date, J.M. became gradually more withdrawn, hid in his room, slept around the clock, lost interest in attending school, and became more angry at home. She testified that his sister, K.M., also had mood changes during the summer of 1999. She also asserted that J.M. attended a private special education academy due to poor attendance at school occasioned by a sleep disorder. Other witnesses testified about J.M.'s aggressive and destructive behavior. One of defendant's brothers-in-law testified that J.M. bragged about setting a field on fire. A neighbor related a beating by J.M. of a neighborhood child. She also witnessed J.M. throw patio furniture off defendant's deck.
On appeal, defendant raises the following points:

*1168 POINT ONE. The Pretrial Exclusion of Expert and Lay Testimony Concerning the Defense of Duress Was Error.
POINT TWO. The Denial of Access to the Victims' School, Psychological, Probation, and Other Records Denied Defendant a Fair Trial.
Prior to trial, defendant sought the school records of J.M. She obtained only his attendance records. The court denied access to the psychological, social work and other school records because defendant had not demonstrated the requisite need for them. Following the testimony of J.M.'s mother, defendant renewed her motion for access to J.M.'s school records. Once again, the motion was denied.
There is a strong interest in protecting the confidentiality of juvenile records. State v. Allen, 70 N.J. 474, 479, 482, 361 A.2d 5 (1976). N.J.S.A. 2A:4A-60 governs disclosure of juvenile information. It states:
a. Social, medical, psychological, legal and other records of the court and probation division, and records of law enforcement agencies, pertaining to juveniles charged as a delinquent or found to be part of a juvenile-family crisis, shall be strictly safeguarded from public inspection. Such records shall be made available only to:
* * *
(6) Any person ... interested in a case ... by order of the court for good cause shown.
[N.J.S.A. 2A:4A-60a(6).]
Access to pupil records are also governed by N.J.A.C. 6:3-6.5, which states:
(a) Only authorized organizations, agencies or persons as defined herein shall have access to pupil records.
* * *
(c) Authorized organizations, agencies and persons shall include only:
* * *
(14) Organizations, agencies and individuals outside the school, other than those specified in this section, upon the presentation of a court order; ...
[N.J.A.C. 6:3-6.5(a); N.J.A.C. 6:3-6.5(c)(14).]
However, a juvenile's records should be available to third persons with a sufficient legitimate interest or when the interests of justice require. Allen, supra, 70 N.J. at 483, 361 A.2d 5.
This court found that relevant school records should be disclosed to a defendant upon a showing of particularized need. State v. Krivacska, 341 N.J.Super. 1, 35, 775 A.2d 6 (App.Div.), certif. denied, 170 N.J. 206, 785 A.2d 435 (2001), cert. denied. 535 U.S. 1012, 122 S.Ct. 1594, 152 L. Ed.2d 510 (2002). We noted, however, that the Confrontation Clause does not require the disclosure of any and all information that might be useful to a defendant. Ibid. (citing Pennsylvania v. Ritchie, 480 U.S. 39, 52-53, 107 S.Ct. 989, 999, 94 L. Ed.2d 40, 54 (1987)).
Balancing the juvenile's right to privacy against the defendant's right to confrontation can be accomplished by an in camera court review of the records. State v. Brown, 132 N.J.Super. 584, 588, 334 A.2d 392 (Law Div.1975). "The party seeking an in camera inspection must advance `some factual predicate which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grasping at a straw.'" State v. Harris, 316 N.J.Super. 384, 398, 720 A.2d 425 (App. Div.1998) (in camera review permitted where defendant showed that police officer was suspended and under investigation for misconduct in conjunction with defendant's allegation that officer had tried to "shake him down") (quoting State v. Kaszubinski, 177 N.J.Super. 136, 141, 425 A.2d 711 *1169 (Law Div.1980) (citations omitted)); see also Krivacska, supra, 341 N.J.Super. at 35, 775 A.2d 6 (trial court properly examined school records in camera for issue of competency of mentally retarded witnesses accusing therapist of sexual abuse).
At trial, J.M.'s mother testified that prior to August 20, 1999, her son "was a very pleasant, helpful, basically what I would consider typical twelve-year old at that time." According to her, his demeanor changed; "he gradually became withdrawn, he would hide in his room. He slept more, more and more around the clock. Lost interest in attending school. And as it got further into winter and spring, he became angry at home." She also testified that after his grandmother's death in February 2000, J.M. retreated to his room and would not communicate with anyone.
Once J.M.'s mother testified about her son's demeanor, the interests of justice required an in camera production of the school records. With nothing more than the attendance records, defendant was left without any resources to rebut the mother's testimony about J.M.'s demeanor and the change in his sleep patterns. To be sure, J.M.'s attendance records provided some information with which to impeach his mother because the attendance records belied her suggestion that his attendance was normal before the 1999-2000 school year. Having found one instance in which his mother's testimony was refuted by school records, the interests of justice required an in camera inspection of the records. Furthermore, an in camera inspection of those documents would not have seriously undermined the confidentiality policy. If the trial judge discovered no information to impeach the credibility of J.M.'s mother, the records would have not been disclosed.
We ordered production of the school records for an in camera inspection by this court. Our examination of the records reveals that J.M. had not only a history of poor attendance since the 1993-94 school year but also that his mother reported concerns about J.M.'s emotional well-being to school authorities as early as September 1997. For example, she advised the school social worker that J.M. refused to get up in the morning to attend school and that he fought or threatened family members to avoid getting up and going to school. His mother also described a turbulent relationship with his parents, including threats to harm his father, depending on J.M.'s mood. She also attributed J.M.'s sleep disorder to the death of an older cousin in June 1997.
J.M. was placed in an out-of-district school for the 1998-99 school year. His attendance improved and there were no reports of disruptive behavior at school. His parents reported to school authorities, however, that he displayed his anger at home which was particularly directed to an older brother and his father. During the 1999-2000 school term, his attendance began to deteriorate. His disposition was described as depressed. He ascribed his difficulties to problems with an older brother.
Although the school reports of the 1999-2000 term support the State's case and may corroborate J.M.'s mother's testimony to some extent, the balance of the records raise serious questions about the mother's credibility. The school records depict a young boy with possibly serious emotional problems at least two years before the assaultive relationship between J.M. and defendant commenced in September 1999. Moreover, the records depict an angry young boy who engaged in oppositional and assaultive behavior towards adults.
The information contained in these records is highly relevant and probative evidence of J.M.'s behavior. It had the *1170 capacity to corroborate defendant's experience with J.M. and to overcome any scepticism which the jury may have had concerning the ability of a slight thirteen year old boy to control and intimidate a thirty-four year old woman.
Here, the interests of justice required an in camera inspection of the school records. Having reviewed those records, we conclude that the records must be disclosed to the prosecutor and defense counsel and that defendant is entitled to a new trial.
When this matter is retried, we expect that defendant will assert once again that she engaged in sexual relations with J.M. under duress. Therefore, we consider whether the trial judge properly barred testimony by a forensic psychologist in support of her defense. We conclude that the testimony was properly barred.
Dr. Witt was prepared to testify that defendant was an anxious, passive, timid woman. According to him, these personality features rendered her easily influenced and easily intimidated. He was also prepared to testify that defendant had a history of anxiety-related problems. He diagnosed an obsessive-compulsive disorder, a panic disorder, elements of post-traumatic stress disorder, and a dependent personality disorder. He concluded that "assuming that there is factual support for her description of the events with the teenager, she clearly felt under duress and coerced by his actions, and such coercion was the causative factor in her offense."
The trial judge ruled that Dr. Witt's testimony was inadmissible. Initially, he observed that most people can discern whether another is passive, timid or anxious given ample opportunity to observe the person. He also concluded that case law established the standard of the reasonable person rather than the idiosyncratic behavior or personality traits of an individual. The trial judge commented that Dr. Witt's testimony would inevitably alter the focus from the reasonable person to the individual.
N.J.S.A. 2C:2-9(a) recognizes duress as an affirmative defense; it provides:
it is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
Prior to the adoption of the penal code on September 1, 1979, but in anticipation of its adoption, the Supreme Court recognized the defense in State v. Toscano, 74 N.J. 421, 378 A.2d 755 (1977). It remains the only case in this State which discusses the "person of reasonable firmness" standard. According to the Court, the defense "focuses on the reasonableness of the accused's fear and his actual ability to resist unlawful demands." Id. at 443, 378 A.2d 755. The Court elaborated that a jury should be admonished to consider a defendant's attributes, such as age and health, but not "the idiosyncracies of an individual's temperament." Ibid. According to one commentator, the standard is intended to take account of "stark, tangible factors which differentiate the actor from another such as his size or strength or age or healthbut not to take account of matters of temperament." Cannel, New Jersey Criminal Code Annotated, comment 4 on N.J.S.A. 2C:2-9 (2003) (citing Final Report of the New Jersey Criminal Law Revision Commission, Vol. II at 71 (1971)).
Defendant argues that a person's health has physical and mental components. Thus, consideration of the state of a person's physical health may not fully reflect the person's "situation." The State responds that consideration of a defendant's *1171 personality departs from the objective standard of a "person of reasonable firmness" articulated in the statute.
The duress defense enacted by the Legislature as part of the New Jersey Criminal Code, N.J.S.A. 2C:1-1 to 104-9, is identical to the duress provision of the Model Penal Code. Model Penal Code § 2.09 (1985). Thus, review of the comments by the Model Penal Code reporters concerning this provision assists our consideration of whether a person's mental status and the idiosyncracies of a person's personality are personal attributes which may be considered by the jury.
The comment to § 2.09, particularly the section which discusses the proper scope of the defense, provides considerable assistance in resolving this question. In the course of the discussion, the reporters reflect on the purpose of legal norms and standards and the standard of conduct imposed on members of the community at which the rule of law can be effective. We quote this discussion at length because it provides an excellent guide for our analysis of this issue.
In favor of allowing the defense, it may be argued that the legal sanction cannot be effective [if the actor is so far overwhelmed by force that his behavior is involuntary] and that the actor may not properly be blamed for doing what he had to choose to do. It seems clear, however, that the argument in its full force must be rejected. The crucial reason is the same as that which elsewhere leads to an unwillingness to vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility. The most that it is feasible to do with lesser disabilities is to accord them proper weight in sentencing. To make liability depend upon the fortitude of any given actor would be no less impractical or otherwise impolitic than to permit it to depend upon such other variables as intelligence or clarity of judgment, suggestibility or moral insight.
Moreover, the legal standard may gain in its effectiveness by being unconditional in this respect. It cannot be known what choices might be different if the actor thought he had a chance of exculpation on the ground of his peculiar disabilities instead of knowing that he does not. No less important, legal norms and sanctions operate not only at the moment of climactic choice, but also in the fashioning of values and of character.
Though, for the foregoing reasons, the submission that the actor lacked the fortitude to make the moral choice should not be entertained as a defense, a different situation is presented if the claimed excuse is based upon the incapacity of men in general to resist the coercive pressures to which the individual succumbed. Here the essential principle is that which Henry Hart has put as follows: "Obligations of conduct fixed by a fair appraisal of the minimum requirements for the maintenance and fostering of community life will, by hypothesis, be obligations which normal members of the community will be able to comply with, given the necessary awareness of the circumstances of fact calling for compliance." [The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401, 414 (1958).] This is to say that law is ineffective in the deepest sense, indeed it is hypocritical, if it imposes on the actor who has the misfortune to confront a dilemmatic choice, a standard that his judges are not prepared to affirm that they should and could comply with if their turn to face the problem should arise. Condemnation in such a *1172 case is bound to be an ineffective threat; what is, however, more significant is that it is divorced from any moral base and is unjust. Where it would be both "personally and socially debilitating" [Id. at 414 n. 31] to accept the actor's cowardice as a defense, it would be equally debilitating to demand that heroism be the standard of legality. The proper treatment of the hero is not merely to withhold a social censure; it is to give him praise and just reward.
[Model Penal Code § 2.09, comment 2 at 374-75 (1985).]
From this discussion we discern that the intent of the drafters of the Model Penal Code was to establish a standard based on a societal norm rather than the exceptional or the substandard attributes of an individual. From this discussion we also conclude that defendant's reaction to J.M.'s threats of harm to her daughter and the physical and emotional abuse heaped on her must be measured by the societal objective norm of the person of reasonable firmness rather than by the multiple personality disorders which characterize defendant.
Consistent with the intent of the drafters of the Model Penal Code, evidence of a person's mental health, such as depression or personality disorders, has been excluded from consideration by a jury in the face of the defense of duress in state jurisdictions which have adopted the Model Penal Code. Marx v. State, 291 Ark. 325, 724 S.W.2d 456 (1987) (defendant's situation did not include emotional upset caused by a recent burglary of his house, a failing business and his mother's poor health); State v. Ianniello, 671 S.W.2d 298 (Mo.Ct. App.1984) (defendant's dyslexia and knowledge of past criminal behavior of another does not establish coercion); People v. Sanchez, 112 Misc.2d 100, 446 N.Y.S.2d 164 (Sup.Ct.1982) (history of depression not a factor for consideration by a jury of duress defense). One exception is a Pennsylvania case, Commonwealth v. DeMarco, 570 Pa. 263, 809 A.2d 256 (2002), which allowed a jury to consider defendant's borderline mental retardation as a factor in its consideration of defendant's defense of duress. The court may have considered defendant's mental retardation a gross or verifiable mental disability which could establish irresponsibility for one's actions. Id. at 262-63.
A person's liability for a criminal act is measured against the standard set by the Legislature for the behavior of the entire community. A defendant's effort to avoid criminal liability should be measured by the same objective societal norm. Here, introduction of evidence that defendant was uniquely susceptible to J.M.'s taunts and threats would inevitably allow the jury to measure defendant's conduct by a standard other than the norm governing the general population. Such a standard is beyond the contemplation of the duress defense and out-of-step with accepted principles of criminal liability. The evidence was properly excluded.
In summary, we affirm the exclusion of testimony by Dr. Witt and evidence of defendant's personality. The trial judge, however, erred when he failed to conduct an in camera review of J.M.'s school records. Because those records contain relevant and probative evidence which may be utilized not only to impeach the credibility of the victim's mother but also to support the duress defense, we reverse the judgment of conviction and remand for a new trial.
Reversed and remanded for a new trial.