834 A.2d 1063

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. B.H., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 1, 2003—Decided November 17, 2003.

Before Judges CONLEY, CARCHMAN and WECKER.

*Yvonne Smith Segars,* Public Defender, attorney for appellant (*Michael Confusione,* Designated Counsel, of counsel and on the brief).

*Peter C. Harvey,* Attorney General, attorney for respondent (*Maura K. Tully,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

A jury found defendant, B.H., guilty of first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a(1) (count one) and third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a as a lesser-included offense of the second-degree crime defined by the same statute (count two). The victim was defendant's seven-year-old stepson, L.H., the child of B.H.'s husband, co-defendant S.H. The cases against defendants were severed, and S.H. entered a guilty plea on June 7, 2002, approximately three weeks after the May 16, 2002 jury verdict in B.H.'s trial. Both defendants were sentenced on September 27, 2002. B.H. was sentenced as a second-degree offender on count one. She received a seven-year state prison sentence on that count and a concurrent five-year sentence on count two. Her aggregate sentence was the same as that received by S.H. under his plea agreement.[1] Because we conclude that the

---

[1] At B.H.'s sentencing hearing, the judge said:

*judge's charge to the jury erroneously limited the purpose for which the jury was permitted to consider expert testimony on the battered woman's syndrome, we reverse defendant's convictions and remand for a new trial.*

## I

There is no dispute about certain aspects of the offense charged. B.H. and S.H. had been living in a motel in 1999, and S.H.'s son was spending the weekend with them.[2] The child walked in on them while they were on the bed, undressed, engaged in sexual relations. S.H. told the child to remove his pants, which he did, and to take S.H.'s place on top of B.H. B.H. neither played an active role in the sexual contact nor attempted to get up and leave. She does not dispute that the child's penis entered her vagina. B.H. testified at trial that she was afraid to refuse S.H.'s demand that she participate because "[h]e had his hands at my throat. He wouldn't let me off the bed. And I told him that I didn't want to do this, that I was not going to do this. And he said that if I didn't go through with this, that he would make me pay and that I would never see my daughter again." In a taped statement to police one-and-one-half years later, however, B.H. denied that S.H. had forced her into the act.[3]

---

There's nothing present by way of mitigation from my viewpoint. I would note, however, that the plea agreement by the State with your then husband who is primarily responsible for what occurred here to his natural son, there's no question about him being the prime moving cause of the event. That plea agreement called for a seven-year sentence which this Court has imposed upon him here today.

Fundamental fairness and parity in sentencing precludes the Court from giving you a more severe sentence than that.

[2] The date of the incident charged in the indictment was an unspecified date between February and September 1999.

[3] The officer who took defendant's statement admitted that defendant had told him about prior incidents of abuse by S.H., which were omitted from his written report of the interview that preceded the taping.

The evidence at trial included B.H.'s testimony about a sexually and physically abusive relationship she endured with S.H. virtually from the start of the relationship. B.H. moved in with S.H. in 1997, at the age of nineteen, only weeks after they met. Shortly thereafter, police were called as a result of a loud argument in the parking area outside B.H.'s mother's house. After the police left and the couple returned home, S.H. became violent, held an ax to B.H.'s throat, and forcibly and repeatedly forced anal and oral sex on her and urinated on her. She testified that he made a "habit out of raping me. He would choke me, . . . he made a game out of choking me until the point where I would pass out, until—letting me go and then trying to punish me because I couldn't get up. And during sex, he would beat me across the chest. There were times that he would handcuff me to the couch and would take me."

In January 1998, S.H. was angry that B.H. had gone out with her girlfriend for the day, and got into a confrontation with the girlfriend's fiancé. When the others left, S.H. pinned defendant against a wall with a knife to her throat. In July 1998, defendant obtained a restraining order and left S.H. Defendant described how S.H. "threatened to kill my entire family . . . [a]nd he told me that he . . . wasn't going to accept . . . that I didn't want to be with him."

Defendant reconciled with S.H. in August 1998 after he promised to change. Defendant testified that while S.H. was on medication, there were no problems. But when he stopped taking the medication after several months, the abuse resumed.

## II

B.H. herself reported the 1999 incident involving L.H. to authorities in March 2001, when she sought refuge from S.H. at a women's shelter. She told a counselor at the shelter about the incident, and the counselor instructed her to report it to the Division of Youth and Family Services ("DYFS"). B.H. did so. Within days of going to the shelter, she reconciled with S.H. once again. After a DYFS worker interviewed B.H., local police visited

her at home and invited her to the police station for an interview. She went voluntarily, driving herself to police headquarters with her two small daughters in tow.

At the station, B.H. was interviewed for close to an hour before her statement was taped. She was immediately placed under arrest, and DYFS took custody of her children. B.H.'s taped statement was played for the jury at her trial. In that statement, after admitting sexual intercourse with L.H., B.H. denied that S.H. had threatened her with physical harm on the day in question:

Q. When this happened, when you had sex with [L.H.] . . . were you, at that point, ever afraid of [S.H.] and what he might do to you if you didn't have sex with [L.H.]?

A. Like I said, he threatened to leave me and I, I love him and I, I don't (inaudible)

Q. Did, what I mean by threatened is did he ever threaten you physically to do you physical harm at that point?

A. No.

Q. Did he have any guns on him at that point?

A. No.

Q. Did he have any knives on him?

A. No.

Q. Any weapons of any sort?

A. No.

Q. Has [S.H.] ever, in the past, physically harmed you? Let me re . . .

A. That's an absolute.

S.H., who was free on bail at the time, was present in the courtroom during the first day of the trial and while B.H. was testifying. Immediately after the jury was excused for lunch, the judge sua sponte addressed S.H., revoked his bail, and had him taken into custody. This is what the judge said:

THE COURT: All right, Mr. [H.], I happened to notice your actions just prior to you leaving the courtroom here today. I regard them as conveying a threat to the defendant presently on trial here, and in an effort to intimidate her.

I'm concerned for her safety at this particular moment. So I am revoking your bail with regard to the charges against you, and remanding you to jail, without bail, until your trial.

[S.H.]: What did I do? I don't understand.

THE COURT: As you opened that door, you turned around and gave both myself and the young lady on the witness stand one of the most threatening glares and glances that I have ever had the opportunity to observe, and I have been around for a long time, sir. That's what you did, and I know that's what you did.

B.H. relied upon a duress defense at trial. See *N.J.S.A.* 2C:2–9. In support of that defense, defendant proffered the testimony of Dr. Roger T. Raftery, a psychologist, who previously had been assigned by DYFS to evaluate B.H. for purposes of determining her fitness to parent her own children. Dr. Raftery was called at trial to offer the jury his opinion that B.H. suffered from battered woman's syndrome, which explained her sincere and reasonable fear of S.H. at the time of the incident and her acquiescence in his demand to engage in sexual activity with his son. After a Rule 104 hearing, the trial judge permitted Dr. Raftery's testimony. The State's rebuttal expert witness, Dr. Timothy J. Michals, a psychiatrist, offered a contrary opinion that defendant was not suffering from battered woman's syndrome at the time of the offense. The judge subsequently instructed the jury on the limited purpose for which Dr. Raftery's opinion could be considered: solely to negate any contention by the State that B.H. behaved recklessly by putting herself in the position to be coerced by S.H.

The judge instructed the jury on the charges set forth in the indictment (as well as the lesser-included endangering charge), consistent with the model jury charges. On each charge, the judge correctly included the burden of disproving duress as an element of the State's case. In explaining the elements of duress, the judge instructed the jury as follows:

In defense of the charges brought by the State, the defendant contends that she is not guilty, because she acted under duress. In other words, she contends that she was coerced to commit the offense due to the use of or threat to use unlawful force against her.

Our state statute with regard to this provides in relevant part as follows: It is an affirmative defense that a defendant engaged in the conduct charged to constitute an offense because she was coerced to do so by the use of or threat to use unlawful force against her person or the person of another, which a person of reasonable firmness in her situation, whatever you determine that to be, would have been unable to resist.

Now, before conduct which would otherwise be criminal can be excused on the ground that such conduct was a direct result of force or threat of force upon the defendant, the evidence must indicate the presence of the following conditions at the time of the offense.

One, that there was the use of or threatened use of unlawful force against the person of the defendant or her daughter. Unlawful force means force which is employed without the consent of the person against whom it is directed.

And two, the force or threatened force must be of such a type that a person of reasonable firmness in a similar situation, whatever you determine the defendant's situation was, would have been unable to resist.

In this regard, you should consider such factors as: One, immediacy, that is, whether the force or threat of force posed a danger of present, imminent and impending harm to the defendant or her daughter; two, the gravity of the harm inflicted or threatened to be inflicted; three, the seriousness of the crime committed by the defendant in relationship to the force used or threatened; four, the age, health, size, mental and physical condition of the defendant and of the individual alleged to have coerced the defendant; five, the possibility for escape or resistance, and the opportunity for seeking official assistance if realistic.

Now, remember, the standard utilized here is that which a person of reasonable firmness in the defendant's situation would have been unable to resist.

Additionally, our state statute provides that the defense of duress is unavailable to a defendant if you find that she recklessly placed herself in a situation that it was probable that she would be subjected to duress.

Under our law, a person acts recklessly when she consciously disregards a substantial and unjustifiable risk. The risk must be of such nature and degree that, considering the nature and purpose of the defendant's conduct in the circumstances known to her, its disregard involves a gross deviation from the standard of conduct that a reasonable person would have observed in the situation.

Here is where the judge instructed the jury on, and limited its consideration of, the battered woman's syndrome evidence:

*Now, with regard to this issue, that is, whether the defendant recklessly placed herself in the situation, I have allowed testimony concerning battered woman's syndrome.* You may or may not determine that the defendant was afflicted with this condition. That is one of the many factual issues that is solely within your province.

Should you determine that she was so afflicted, that does not establish that she acted under duress. *The sole purpose for which that evidence is offered to you is to explain why the defendant continued to live with her husband and why she hadn't left him. It may be considered, if you find it credible, on the issue of recklessness.*

*The experts' testimony, then, regarding battered woman syndrome was not offered to establish that a person of reasonable firmness in the defendant's situation would not have been unable to resist, but, rather, to clear up any misconceptions*

*that you may have concerning the activities of battered women, and to understand a battered woman's state of mind.*

Now, the State has the burden to prove beyond a reasonable doubt each of the elements of the offense.... The state also has the burden to disprove beyond a reasonable doubt the defense of duress.

[ (Emphasis added).]

At the end of the jury charge, defense counsel objected as follows:

Just my only objection is the Court indicating that the battered woman syndrome would only go towards recklessness. I would just put on the record I would believe that it would go to her situation or similar situation on the part of duress.

We're talking about the reasonable person in her situation, reasonable firmness in a situation, reasonable firmness in a similar situation, to explain what her situation actually was in this case.

THE COURT: I think I made that rather clear myself with regard to my charge, so I'll note your exception, and I think the charge was sufficiently appropriate.

We cannot tell what the judge meant by saying "I think I made that rather clear." What is clear is that the judge limited the jury's consideration of Dr. Raftery's testimony to the question whether defendant had been reckless in exposing herself to the situation involving L.H. in 1999.

### III

Seven months after the jury returned its verdict, and a month after both defendants were sentenced, B.H. filed a motion for a new trial, based upon purportedly newly-discovered evidence. That evidence was a handwritten, notarized statement of S.H., dated July 3, 2002, as well as a June 11, 2002 letter to the trial judge. The July 3 statement includes the following:

This letter is to confirm the statements made by [B.H.] about coercion and physical restraint.

I [S.H.] did forcibly hold [B.H.] down on the day in question, It was with said force applied that she did not struggle for fear of hers and her daughters life. You see I am responsible I did put her in such fear for her life through constant physical abuse and threat there of she couldn't leave, also I forced her compliance by telling her if she spoke she would lose her daughter as well. I ask to be brought before court and couns[e]l to testify for [B.H.] and make amends for my actions.

The import of the June 11 letter was S.H.'s claim that he had been present in the courtroom to testify on B.H.'s behalf, that he

had tried to inform her trial attorney of his intention "the day before her trial, but he walked away from me," and that he had "notified my lawyer on Jan. 7th, 2002 when I was unsuccessful in try [sic] to deal for [B.H.'s] release with your prosecutor." The letter continued:

> I knew I would not be going home. But that was of little concern to me I only sought to set things right and accept responsibility for myself.
>
> [B.H.]   is not a crimminal [sic] nor prone to crimminal [sic] acts.
>
> I am afraid her story is one of love, loyalty, and revenge.
>
> [B.H.]   had broken my heart and I wanted revenge. So I cannot say she didn't have reason to fear. She feared for herself and her daughters and it was that fear that had kept her quiet on this time. So you see I failed my beloved and my children worse I fear that in your zealousness the state of New Jersey has failed her and [our children]. She came to "you" to protect her and save her children and "you" have destroyed both.
>
> Again I beg to consider giving [B.H.] a new trial. If I had been given a chance to speak things would be different and I might still deserve the love of my children.

The trial judge denied defendant's new-trial motion on the grounds that S.H.'s testimony was unlikely to make a difference in light of B.H.'s own statement to police, and that S.H.'s proposed testimony was neither newly discovered nor previously unavailable.

## IV

On appeal, defendant presents these arguments:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL.

POINT II

THE TRIAL COURT'S CHARGES ON DURESS AND THE BATTERED WOMAN'S SYNDROME WERE INSUFFICIENT.

POINT III

THE TRIAL COURT UNDULY LIMITED DEFENDANT'S RIGHT TO IN-TRODUCE EVIDENCE AND ARGUE TO THE JURY THAT SHE SUF-FERED FROM THE BATTERED WOMAN'S SYNDROME AND ACTED UN-DER DURESS AT THE TIME OF THE INCIDENT AT ISSUE.

POINT IV

THE PROSECUTOR'S COMMENTS DENIED DEFENDANT A FAIR TRIAL.

POINT V

THE SENTENCE IMPOSED BY THE TRIAL COURT IS EXCESSIVE.

We have carefully considered the record and the briefs in light of applicable law. We are satisfied that there is insufficient merit in the arguments raised in Points IV and V to warrant extended discussion in a written opinion. *See R.* 2:11-3(e)(2). As we shall explain in Part V of this opinion, error in the jury charge requires a new trial. Thus the issue raised in Point I is moot in light of the anticipated retrial.

We do not address the arguments raised by defendant in Point III because we do not know what evidence (or indeed what witnesses) will be proffered in a retrial. By abstaining from any hypothetical ruling, we imply neither approval nor disapproval of the challenged evidentiary rulings. We leave it to the judge on retrial to consider each proffer and any objections in the context of the evidence adduced.

## V

Expert testimony explaining battered woman's syndrome and offering an opinion that an individual suffered from the effect of that syndrome has been allowed in New Jersey courts for specific, limited purposes since the first reported decision on the issue in *State v. Kelly*, 97 *N.J.* 178, 478 *A.*2d 364 (1984) (syndrome evidence is relevant to claimed justification of self-defense in a homicide). *See State v. Gartland*, 149 *N.J.* 456, 694 *A.*2d 564 (1997) (syndrome evidence is relevant to objective and subjective elements of self-defense); *State v. Tierney*, 356 *N.J.Super.* 468, 813 *A.*2d 560 (App.Div.) (same), *certif. denied*, 176 *N.J.* 72, 819 *A.*2d 1188 (2003); *Giovine v. Giovine*, 284 *N.J.Super.* 3, 663 *A.*2d 109 (App.Div.1995) (relevant to establish continuing tort, to toll statute of limitations), *overruled on other grounds, Brennan v. Orban*, 145 *N.J.* 282, 678 *A.*2d 667 (1996).

In *Kelly*, Chief Justice Wilentz, writing for the Court, addressed an issue "of first impression in this state." *Id.* at 187, 478 *A.*2d 364. The Court held that the defendant's proffered expert testimony on battered woman's syndrome should be admitted and

therefore ordered a new trial. Conditioned upon further examination of the expert's testimony in what was then a new field, the Court held that "testimony on the battered-woman's syndrome shall be admitted as relevant to the honesty and reasonableness of defendant's belief that deadly force was necessary to protect her against death or serious bodily harm." *Ibid.*

In *State v. Gartland, supra,* 149 *N.J.* 456, 694 *A.*2d 564, the defendant's appeal from her manslaughter conviction raised questions about the adequacy of the jury charge on self-defense. Defendant had been the victim of years of spousal abuse before she shot and killed her abusive husband. The specific issues in that case related to the statutory duty to retreat. In its per curiam opinion, the Court described its prior decision in *Kelly* as holding "that evidence of domestic abuse is relevant to a claim of self-defense. Specifically, the Court held that expert testimony concerning the battered women syndrome is relevant to the jury's determination of subjective honesty and the objective reasonableness of a defendant's belief that deadly force was necessary to protect herself against death or serious bodily harm." *Gartland,* 149 *N.J.* at 472, 694 *A.*2d 564. The opinion went on to say that "the elements of self-defense contain subjective and objective factors that focus, respectively, on the sincerity and reasonableness of the defendant's beliefs." *Ibid.* The Court reversed Gartland's manslaughter conviction, holding that "[a]t a minimum, the jury ... should have been asked to consider whether, if it found such to be the case, a reasonable woman who had been the victim of years of domestic violence would have reasonably perceived on this occasion that the use of deadly force was necessary to protect herself from serious bodily injury." *Id.* at 476, 694 *A.*2d 564.

In *State v. Tierney, supra,* 356 *N.J.Super.* at 468, 813 *A.*2d 560, the jury rejected the claim of self-defense despite having heard both the defendant's history of domestic abuse and expert testimony on the battered woman syndrome. We affirmed the murder conviction, rejecting the defendant's claim of error in the jury charge for failure sufficiently to relate the law of self-defense to

the syndrome evidence. Nonetheless, in describing the relevance of evidence of domestic abuse to a claim of self-defense, Judge Lisa wrote: "Expert testimony relating to battered woman's syndrome is germane to the jury's assessment of the subjective honesty as well as the objective reasonableness of a defendant's belief that deadly force was necessary.... Expert testimony is useful to refute common misconceptions concerning evidence of prior abuse and the reaction of battered women." *Id.* at 478, 813 *A.*2d 560.

The Supreme Court explained its decision in *Kelly* in another context in *State v. J.Q.*, 130 *N.J.* 554, 617 *A.*2d 1196 (1993), holding that expert testimony on child sexual abuse accommodation syndrome is admissible to establish that a victim's symptoms are consistent with sexual abuse and to explain a delay in reporting abuse or recanting allegations of abuse. In *J.Q.*, Justice O'Hern analogized the use of child sexual abuse accommodation syndrome to the use of battered woman's syndrome allowed in *Kelly*. "[T]he evidence enables the jury to overcome common myths or misconceptions that a woman who had been the victim of battering would have surely left the batterer. Thus, the evidence helps the jury to understand the battered woman's state of mind .... to counter the myths." *State v. J.Q.*, 130 *N.J.* at 574, 617 *A.*2d 1196.

The judge here explicitly told the jury that it could consider the evidence that defendant suffered from battered woman's syndrome *only* "to explain why the defendant continued to live with her husband and why she hadn't left him. It may be considered, if you find it credible, on the issue of recklessness [and not] ... to establish that a person of reasonable firmness in the defendant's situation would have been unable to resist."

On the evidence presented, there was no serious contention by the State that defendant's recklessness barred the defense of duress. The issues for the jury on the duress defense were the nature and extent of the threat posed by S.H., the honesty and reasonableness of B.H.'s perception of that threat, and her inabili-

ty to resist his demand.[4]  By limiting the jury's use of the battered woman's syndrome testimony to "explain[ing] why the defendant continued to live with her husband and why she hadn't left him," and by precluding the jury from considering such evidence "to establish that a person of reasonable firmness in the defendant's situation would have been unable to resist," the judge effectively removed Dr. Raftery's testimony about battered woman's syndrome (assuming the jury believed it) from any meaningful consideration in addressing defendant's duress defense.

The question before us is whether defendant was entitled to an instruction that the jury could consider evidence that she suffered from battered woman's syndrome for purposes of determining the "honesty and reasonableness of [her] belief" that S.H. was using or threatening the "use of unlawful force against her or their daughter, which a person of reasonable firmness in [her] situation would have been unable to resist."

The Code defines the elements of self-defense (*N.J.S.A.* 2C:3–4)[5] and duress (*N.J.S.A.* 2C:2–9)[6] in different terms.  Nonetheless, the defenses are similar in that each prescribes an objective standard, yet has a subjective component.  *Compare* Cannel, *New*

---

[4] There was a threshold question for the jury, whether S.H.'s words or conduct included any threat, given B.H.'s statement to police.

[5] *N.J.S.A.* 2C:3–4a provides, in relevant part:

> [T]he use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

[6] *N.J.S.A.* 2C:2–9 provides, in relevant part:

> a.  Subject to subsection b. of this section, it is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
> b.  The defense provided by this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress.

*Jersey Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:3–4 *with* comment 4 on *N.J.S.A.* 2C:2–9 (2003). In the case of self-defense, the objective standard is a reasonable belief that force is necessary to protect against the use of unlawful force. The subjective component is the defendant's actual belief on "the present occasion." In the case of duress, the objective standard is whether a person "of reasonable firmness" in her "situation" would fail to resist coercion in the form of unlawful force or threat to use unlawful force. The subjective component is the defendant's actual fear. But the objective standard is the reasonable person suffering from battered woman's syndrome as a result of a history of battering.

We have found no New Jersey case expressly comparing the two defenses—self-defense and duress—in the context of battered woman's syndrome or any similar issue. In the absence of controlling authority to the contrary, we view the duress defense as sufficiently parallel to the justification of self-defense to conclude that expert testimony respecting battered woman's syndrome is available for similar purposes in both cases. *See United States v. Marenghi,* 893 *F.Supp.* 85 (D.Me.1995) (denying the Government's in limine motion to exclude expert testimony regarding the role of battered woman's syndrome to support a duress defense). The District Court Judge explained:

> This Court has also found it helpful to examine the treatment by other courts of battered woman syndrome expert testimony as part of a self-defense theory, rather than a duress defense. The two defenses are similar in that they require a defendant to demonstrate that she acted reasonably in response to a reasonable fear of death or bodily injury.
>
> [*Id.* at 95.]

The judge concluded: "This Court cannot envision that such evidence should be excluded in a duress defense when it is admitted in an overwhelming majority of state courts in self-defense cases." *Id.* at 96. *See also* Kelly Grace Monacella, *Supporting a Defense of Duress: The Admissibility of Battered Woman Syndrome,* 70 *Temp. L.Rev.* 699 (1997). The author concludes:

> Courts cannot continue to ignore the striking similarities between the defenses of duress and self-defense. These similarities dictate the courts' logical progression from admitting evidence of battered woman syndrome in self-defense cases to admitting such evidence to support a defense of duress.
>
> [*Id.* at 743.]

Other legal commentators, describing battered woman's syndrome as a form of post-traumatic stress disorder, conclude that "[b]ecause duress and self-defense both require proof of similar elements, it is illogical to permit PTSD testimony in one but not the other." Edgar Garcia–Rill & Erica Beecher–Monas, *Gatekeeping Stress: The Science and Admissibility of Post-traumatic Stress Disorder*, 24 *U. Ark. Little Rock L.Rev.* 9, 34–35 (2001) ("Garcia–Rill").

The objective/subjective dichotomy characterizing much of the legal discussion of the duress defense may not be a useful analytical approach. There is both a lack of "unanimity among courts regarding the precise elements of the [duress] defense" and limited case law "address[ing] the applicability of evidence of battered woman syndrome in the case where a duress defense is raised." *United States v. Marenghi, supra,* 893 *F.Supp.* at 92. Noting that "[p]art of the complexity of the issue is that the distinction between subjective and objective evidence is not as clear as the Government asserts," *id.* at 94, the judge continued:

> This can be demonstrated by changing the "snapshot" of circumstances that is shown to a jury in any particular case. If the jury sees the defendant's circumstances immediately prior to commission of the crime and there is no gun held to her head or other markedly extreme duress, the jury may conclude that any fear of imminent death or violence was unreasonable. However, if the defendant is permitted to pull the camera back to provide the broader picture, so to speak, of her circumstances, the jury could learn of a pattern of violence, control, and coercion leading up to the criminal act. Expert testimony could be helpful to explain to the jury how a reasonable person reacts to repeated beatings and emotional abuse. Providing the jury with information of specific incidents of abuse while providing no information about how such treatment can, over time, establish a dynamic where the threat of abuse hovers over every interaction between the individuals, even if such threat is not always articulated, would give the jury only half of the story. In effect, this expert testimony may be characterized as explaining how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment.

[*Id.* at 94–95 (Footnotes omitted).]

As one commentator recommends:

> courts can utilize evidence of battered woman syndrome while continuing to preserve the objective inquiry of duress [and that] [a]lthough many courts fail to perceive battered woman syndrome evidence as anything but inherently subjective, the objective use of battered woman syndrome evidence proposed by this Comment is not a novel approach.

[Monacella, *supra*, 70 *Temp. L.Rev.* at 743.]

Our Supreme Court has allowed evidence of battered woman's syndrome as relevant to the subjective honesty and objective reasonableness of a defendant's belief that she was threatened with serious or deadly bodily injury to justify the use of deadly force on her attacker. Similarly, we conclude that evidence that defendant suffered from battered woman's syndrome as a result of S.H.'s prior abuse was relevant to the jury's determination whether she was coerced by fear of serious harm to herself or her daughter that was honestly held and reasonable "in her situation." That situation may include a history of battering and the condition known as battered woman's syndrome.

Our recent decision in *State v. Van Dyke,* 361 *N.J.Super.* 403, 825 *A.*2d 1163 (App.Div.2003), is not to the contrary. There, although we reversed the sexual assault conviction of a thirty-four-year-old married woman who repeatedly engaged in sexual relations with a thirteen-year-old boy, we rejected the defendant's argument that she was entitled to present expert testimony of a psychologist to support her duress defense. Unlike the case before us, in *Van Dyke* there was no evidence and no opinion proffered concerning battered woman's syndrome.

The proffered testimony that we rejected in *Van Dyke* was "that defendant was an anxious, passive, timid woman [whose] personality features rendered her easily influenced and easily intimidated." *Id.* at 414, 825 *A.*2d 1163. The expert was "prepared to testify that defendant had a history of anxiety-related problems [and] concluded that ... 'assuming there is factual support for her description of the events with the teenager, she clearly felt under duress and coerced by his actions, and such

coercion was the causative factor in her offense.' " *Id.* at 414–15, 825 *A.*2d 1163. In *Van Dyke,* Judge Cuff described the Supreme Court's opinion in *State v. Toscano,* 74 *N.J.* 421, 378 *A.*2d 755 (1977), respecting the common law defense of duress, as "the only case in this State which discusses the 'person of reasonable firmness' standard [and] 'focuses on the reasonableness of the accused's fear and his actual ability to resist unlawful demands.' " *Van Dyke,* 361 *N.J.Super.* at 415, 825 *A.*2d 1163 (quoting *Toscano,* 74 *N.J.* at 443, 378 *A.*2d 755).

Irrespective of whether we describe the standard of the duress statute—a "person of reasonable firmness" in the defendant's "situation"—as an objective or a subjective standard, a defendant's personality or temperament are impermissible considerations in applying that standard. By contrast, a woman who offers credible evidence that she suffered from battered woman's syndrome, a result of having been battered by the very person she claims coerced her into the criminal conduct, is entitled to a jury instruction to consider that evidence as part of the "situation" in which the reasonableness of her conduct is judged.

Accordingly, we find that the judge erred in limiting the jury's use of the battered woman's syndrome evidence. That error was "clearly capable of producing an unjust result," *see R.* 2:10–2, and a new trial is required.

Reversed.