STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. IKE McALLISTER, DEFENDANT-APPELLANT.

Argued December 2, 1963—Decided January 20, 1964.

*Mr. Paul E. Anderson* argued the cause for defendant-appellant.

*Mr. William D. Danberry* argued the cause for plaintiff-respondent (*Mr. Edward J. Dolan,* Middlesex County Prose-

cutor, attorney; *Mr. William D. Danberry,* Assistant County Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

HANEMAN, J. Defendant appeals directly to this court from a conviction of murder in the second degree. *R. R.* 1:2–1(c).

The evidence at the trial discloses that defendant and one Aaron Williams, for whose murder he was indicted, lived in "Hagerty's Tenant House" at Cranbury. Each of them occupied separate quarters. On February 25, 1962, while in Williams' room, defendant struck him on the head and shoulder with an ax, inflicting injuries which rendered him unconscious and from which he died on March 22, 1962, without having regained consciousness.

Although there exists some conflict in the details of the events of February 25, the following facts appear from the testimony, a large part of which was supplied by the only eyewitness, Charles Williams (no relation to the deceased), also a tenant at Hagerty's. At about 8 A. M. Charles drove defendant and the latter's girl friend from Cranbury to her home in Hightstown. From there he drove defendant to Forsgate Country Club, where defendant was employed, and waited for him for approximately five minutes. They then proceeded to Jamesburg to visit a friend, and thence to visit another friend in Cranbury, returning to Hagerty's at about 9 A. M. They proceeded to their respective rooms. At about 10 o'clock Charles saw defendant in the room of Aaron Williams. Defendant and Aaron were cursing back and forth in their usual "joking" manner. Aaron picked up a brick from under his bed and stated that he would knock defendant's head in with it. The three, who had been drinking, began to shoot craps at about 11 A. M. Both Aaron and Charles continued to drink during the game. Charles did not observe defendant further imbibing there. Both Aaron and defendant lost some money to Charles. Charles, having left Aaron's room for some ten minutes, upon his return heard defendant

demand that Aaron repay him some money, which he asserted Aaron had improperly taken in the previous night's game. Aaron denied that he owed defendant any money. Charles related that "they cursed back and forth at each other." He stated that Aaron had neither a knife nor a brick in his hand at this time. Defendant left the room and returned five or ten minutes later with an ax in his hand. While Aaron was sitting on his bed defendant struck him on the head with the ax. Aaron fell to his hands and knees. Defendant then struck him with the ax on the left shoulder and on the back of the head. Defendant left the room and threw the ax into the yard in the rear of the house.

Defendant's testimony, although similar to that of Charles in the main, portrayed a different picture of the facts immediately preceding and during the assault upon the deceased. He stated that Aaron made a number of threats against his life before and during the dice game. While playing, they argued and cursed each other. Aaron either hit him or struck at him. Aaron then came toward defendant with a knife. Defendant pushed him back and said, "I don't want to hurt you, boy." Defendant got his ax, which was just outside the door of Aaron's room. The ax had been left there that morning, he testified, by one Horse Drawn, who had borrowed it some time previously. Aaron kept approaching defendant, who attempted to push him away with the ax and then hit him on the shoulder and head with it, in self-defense. Defendant said he then left and went to his own room.

The defendant advances the following reasons for reversal:

## I.

The trial court failed to reinstruct the jury that the State had to prove beyond a reasonable doubt that the plea of self-defense was untrue.

■ It is admitted that in the original charge the court adequately charged the jury that there were five possible verdicts, *i. e.*, murder in the first degree; murder in the first

degree with a recommendation; murder in the second degree; manslaughter; not guilty, and also properly charged the burden of the State in connection with the defense of self-defense.

After retiring and deliberating for some time the jury sent a note to the court which reads: "Your Honor, the jury would like to hear again the explanations or charge of the five possible verdicts. Our deliberation has reached a point where a repeat explanation would expedite our decision." The court proceeded to repeat its original charge concerning these five possible verdicts and also reiterated the portion of the charge delineating the elements of self-defense. He did not, however, reinstruct the jury that the State had the burden of proving beyond a reasonable doubt that the defense of self-defense was untrue. When this omission was objected to by defense counsel the court stated that the jury did not request an additional charge on the burden of proof and defendant's counsel replied, "All right, your Honor."

The record discloses that a detailed and proper charge on the State's burden of proof was originally given by the court. We find no error in the court's failure to recharge as noted. The jury did not request instruction thereon and the repetition of the charge as above stated was clearly, as the trial court announced, "not all of it [the entire original charge] but the part that you apparently wish to have read to you." It cannot be said that the procedure adopted eliminated the original charge on the burden of persuasion. To the contrary, the jury was in effect instructed on the recharge that the answer to its query was specifically limited to the question which it propounded and was given in the light of the balance of the original charge, including the charge on the burden of persuasion.

II.

The use by Doctor Shoemaker of matters not in evidence as a basis for his opinion, where such opinion was an essential element of the case.

 Doctor Shoemaker, a neurosurgeon who had operated on and treated the deceased while he was in the hospital because of the injuries inflicted by defendant, was a witness for the State. On direct examination, in answer to the question: "* * * Doctor, having examined this man when he came to the hospital, having examined the x-rays, having treated him from February 25, 1962 until the date of his death, can you tell the jury, in your considered medical opinion, what the cause of his death was?" He replied, "The cause of death was due to a massive brain injury sustained at the time he had — his brain was injured, however it might have been injured." On cross-examination, after considerable questioning with allusion to facts allegedly appearing on the autopsy report, in answer to the question: "Since you did not perform the autopsy in this case, I assume you would not want to say, with any degree of positiveness, the cause of death, would you?" he testified, "Not without being able to read the autopsy report." Defendant did not move to strike the doctor's testimony as to the cause of death.

On redirect examination the doctor was shown the autopsy report of Doctor Wilentz, chief medical examiner of Middlesex County, which included a report of a pathologist not called as a witness by the State. The autopsy report, although marked for identification, was not then introduced into evidence, but was later admitted as a defense exhibit, with only a "history" paragraph deleted. This paragraph reads as follows:

"The deceased was struck on the head with an ax on Feb. 25th during an argument on the Judson Hagerty farm—transferred to the Middlesex General Hospital where he was admitted at 3 P. M.— during his stay there, brain surgery was performed but deceased never regained consciousness and died early this morning."

After examining the autopsy report, Doctor Shoemaker was then questioned:

"Doctor, based on your training and experience as a brain surgeon, based on your examination of Aaron Williams, your treatment of

him, and based on your examination now of the autopsy report, which has just been given to you, can you now say with positiveness as to what the cause of death was?"

and he replied:

"I think the probable cause of death was due to the massive brain injury sustained."

The defendant argues that both the history and the report of the pathologist were incompetent as hearsay. Defendant also contends that a hypothetical question which includes the opinion of another is incompetent, and that since the opinions of the pathologist and Doctor Wilentz were included in the autopsy report, a hypothetical question incorporating those opinions is improper. He relies upon *Stanley Co. of America v. Hercules Powder Co.*, 16 *N. J.* 295 (1954).

Remembering that Doctor Shoemaker was the decedent's attending surgeon and physician until the day of decedent's death and had already testimonially expressed his considered medical opinion as to the cause of death, based upon his personal observation to the terminal date, it appears that the purpose of the reference to the autopsy report on cross-examination was to suggest that factual findings appeared thereon which could result in the conclusion that there were other possible causes of death. Defendant thus attacked the opinion of Doctor Shoemaker upon the basis of his lack of knowledge of the decedent's *post mortem* condition. The thrust of his questioning was directed at the weight to be accorded to the opinion rather than to its admissibility. With the issue thus raised it became necessary for the State to present the report to Doctor Shoemaker in order for him to determine whether any facts appeared thereon which were either inconsistent with or which would weaken his original opinion. The object of submitting the autopsy report to the doctor on redirect examination was to rebut the implication that the autopsy report later inserted into the trial by defendant, revealed facts not already within his knowledge which would

force a conclusion contrary to that independently arrived at by him. This examination thereof can not be said to have been for the purpose of forming an opinion based upon an opinion of another expert. Doctor Shoemaker had already formed and expressed an opinion based upon personal observation and treatment of the deceased, the details of which he had recited. *Stanley Co. of America, supra,* is inapposite.

As to the "history" paragraph appearing in the autopsy report, even if it be assumed that it was relied upon by Doctor Shoemaker, as urged by defendant, it is a brief recital of facts later testified to by witnesses and not disputed by defendant. The opinion would then have been based on facts actually elicited later at the trial. We find no error.

## III.

The Prosecutor made statements in his opening and closing which find no support in the evidence and which prejudiced defendant's plea of self-defense.

In the State's opening, the prosecutor stated that "He * * * as the State contends, stealthily walked behind Aaron Williams" and struck him with an ax. In summation, the prosecutor asserted that just before the blows were struck defendant was "right behind Aaron Williams." It is to be noted, parenthetically, that the State did not then categorize his approach as "stealthy." Following objection by defense counsel to the summation statement, the following transpired:

"MR. DOLAN: It is my recollection. That is for the jury.

THE COURT: It will be for the jury to determine whether or not counsel has correctly recited the evidence as the jury heard it.

MR. DOLAN: Behind him, or at least next to the bed in front of the rocking chair, whatever your recollection is."

 The description of defendant's approach in the opening was improper if the prosecutor knew he could not support the statement by proof. "A prosecutor may state in

his opening only facts he intends in good faith to prove by competent evidence." Failure of proof to meet expectations is not cause for reversal "unless allegations * * * are completely unsupported by the evidence and there is a showing of prejudice to the defendant and bad faith by the prosecutor." *State v. Hipplewith,* 33 *N. J.* 300, 309 (1960). It cannot here be said that the prosecutor was guilty of bad faith in stating in his opening what he intended to prove. The evidence as finally adduced could have been construed to sustain a finding that defendant did approach the deceased from the rear. In the light of the nature of the statement, the actual proof and the court's charge, it cannot be said that defendant was prejudiced.

The prosecutor apparently believed that the evidence supported his summation re-creation of defendant's alleged attack upon the deceased. The evidence was such that it could have been construed to support his assertion. In any event, the above-quoted colloquy between counsel and the court deprived the statements of any possible prejudicial effect.

## IV.

### The inadequacy of the court's charge on manslaughter.

▮ It is to be noted at the outset that defense counsel made no objection to this phase of the original charge nor of the repetition thereof pursuant to the jury's request.

Defendant's request to charge on manslaughter was encompassed within the charge as delivered. However, defendant now states that the court's failure, *sua sponte,* to include an instruction that defined and explained the essential nature of manslaughter in relation to the proven facts constituted plain error.

Although more detailed instructions relating the facts of the case to the essentials of manslaughter might have been given by the court, the charge was adequate.

# V.

The court's failure to charge that severe mental and emotional defects could be considered on the question of whether defendant had the requisite intent to cause the decedent grievous bodily harm, and that where a defendant is burdened with such mental and emotional defects a homicide may be mitigated from murder to manslaughter by a stimulus less provoking than that necessary for a person not suffering from such defects.

Here again, defendant neither objected at the trial to the failure of the court to charge as above suggested, nor requested the charge which he now advocates.

The effect of defendant's argument is clearly capsulized in the following statement found in his brief:

"Thus, we ask this court to adopt a rule which permits evidence of defendant's mental and emotional defects to be introduced and used by the jury on the issue of provocation. We ask that in such circumstances an instruction should be given that if they believe there is serious emotional and intellectual impairment—in this case to such an extent that his intellectual age is less than seven years—the law recognizes that it takes less stimulus to adequately provoke such a person than that amount which would be necessary to sufficiently provoke an adult mind."

■ Admittedly, proof of the mental capacity of defendant is admissible on the issue of whether the alleged crime was murder in the first or second degree. In *State v. DiPaolo*, 34 *N. J.* 279 (1961) this court stated, at *p.* 295:

"* * * The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted."

See also *State v. King*, 37 *N. J.* 285 (1962). Defendant was convicted of murder in the second degree, hence the failure of the court to charge as now suggested is not material in connection with the degrees of murder.

■■ The answer to defendant's argument as it relates to manslaughter, is found in our test for the mitigation of a homicide from murder to manslaughter. In *State v. King, supra,* this court recognized the English test as the proper one to apply for that purpose. As we there stated, 37 *N. J.* 300, this is a two-stage process composed as follows:

"(1) the provocation must be so gross as to cause the ordinary reasonable man to lose his self control and to use violence with fatal results, and (2) the defendant must in fact have been deprived of his self control under the stress of such provocation and must have committed the crime while so deprived."

■■■ The distinction between the reasons for the admissibility of evidence concerning a defendant's mental capacity in connection with a murder charge and the inadmissibility thereof in connection with a manslaughter charge are aptly expressed in *Weihofen and Overholser, Mental Disorder Affecting the Degree of Crime,* 56 *Yale L. J.* 959 (1947), at *p.* 969:

"The murder-manslaughter distinction has a wholly different history and is based on wholly different criteria from those involved in distinguishing degrees of murder. The former is of common law, the latter statutory; the former involves an objective test, the latter subjective. The provocation which at common law reduces a homicide to manslaughter must be such as is calculated to produce hot blood or passion in a reasonable man, an average man of ordinary self-control. Unless it meets this objective standard of reasonableness, the subjective fact of passion does not make the killing manslaughter. Such factors as mental abnormality or intoxication are therefore irrelevant, since the 'reasonable man' standard postulates a sane and sober man."

Defendant's proffered thesis would make the criterion entirely a subjective test of the actual effect of the action of the deceased upon the mind of the particular defendant charged with his homicide. The application of the "ordinary man" test as the objective standard against which to measure the subjective fact of passion, makes defendant's suggested individual subjective test inappropriate. Such a norm presupposes an "ordinary" man, which expression by its very nature

354

contemplates a person without "serious mental and emotional defects."

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.