870 A.2d 273

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. B.H., DEFENDANT–RESPONDENT.

Argued September 28, 2004—Decided April 13, 2005.

172

*Maura K. Tully,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Michael J. Confusione,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

A jury convicted defendant, B.H., of first-degree aggravated sexual assault and third-degree endangering the welfare of a child, for having engaged in sexual intercourse with her seven-year-old stepson. Defendant was convicted, notwithstanding her defense that she was a battered wife who participated in the sexual act under duress exerted by her husband.

The trial court permitted defendant to present expert testimony about battered woman syndrome [1] but restricted its content and

---

[1] Decisions, treatises, and journal articles alternately refer to the syndrome as both "battered woman syndrome" and "battered women syndrome." We have chosen to use "battered woman syndrome" because it is the original name given to the syndrome in Lenore Walker's treatise on the subject. Lenore Walker, *The Battered Woman Syndrome* (1984).

use. On appeal, the Appellate Division disagreed with the limitations placed on that evidence and reversed defendant's conviction. *State v. B.H.*, 364 *N.J.Super.* 171, 834 *A.*2d 1063 (2003). We granted certification, 179 *N.J.* 311, 845 *A.*2d 135 (2004), to address the appropriate use of battered woman syndrome expert testimony in respect of a duress defense under *N.J.S.A.* 2C:2–9.

## I.

In March of 2001, B.H. left her husband, S.H., and took their two young daughters to a women's shelter. While there, she informed a counselor that in 1999 her husband had forced her to have sexual intercourse with her then seven-year-old stepson, L.H. At the counselor's urging, she reported the incident to the Division of Youth and Family Services (DYFS); however, she reunited with her husband when she left the shelter.

DYFS promptly conducted an investigation of the home, and an investigator from the Ocean County Prosecutor's Office contacted B.H. At the investigator's request, B.H. agreed to be interviewed. She appeared voluntarily at police headquarters and was administered *Miranda*[2] warnings. She then talked with investigators for approximately an hour before making a taped statement in which she admitted to having engaged in sexual intercourse with her stepson while her husband watched.

In her statement, B.H. told the investigators that her husband, S.H., had physically and sexually assaulted her on other occasions but she denied that he had threatened her with any violence on the day that the incident with her stepson took place.

Q. Did he threaten you in any way?

A. At one point when I said that I didn't think it was a good idea, he said that he would leave me if I didn't.

\* \* \*

_____

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Q. When this happened, when you had sex with [L.H.] ... were you, at that point, ever afraid of [S.H.] and what he might do to you if you didn't have sex with [L.H.]?

A. Like I said, he threatened to leave me and I, I love him and I, I don't (inaudible).

Q. Did, what I mean by threatened is did he ever threaten you physically to do physical harm at that point?

A. No.

Q. Did he have any knives on him?

A. No.

According to B.H., S.H. justified the intercourse as something that would be "good" for her to do with L.H., "that it would help [them] get along better." B.H. was arrested and charged with first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a(1) (count I), and second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a (count II).[3]

At trial it was brought out that in July of 1999, B.H. and S.H. were living in a motel with their infant daughter. S.H.'s son, L.H., was spending the weekend with them, as he frequently did. Sometime during the afternoon, L.H. entered the motel room and discovered his father and B.H. having sexual intercourse on the bed. S.H., having noticed that his son was observing them, told L.H. to lower his pants and placed the child on top of B.H., who lay naked with her legs apart. In accordance with S.H.'s directions, L.H. engaged in sexual intercourse with B.H. for several minutes. B.H. did not protest or attempt to leave, although she claimed that she remained passive during the sexual act. However, in her trial testimony, her description of what had happened that afternoon differed from her prior statement to police. She now claimed that S.H. had threatened her.

He had his hand at my throat. He wouldn't let me off the bed. And I told him that I didn't want to do this, that I was not going to do this. And he said that if I

---

3 S.H. also was indicted as a result of the incident. One count charged him with complicity to commit aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(1) and *N.J.S.A.* 2C:2–6, and a second count charged him with endangering the welfare of a child in violation of *N.J.S.A.* 2C:24–4. He pled guilty pursuant to a plea bargain and was sentenced to a custodial term of seven years.

didn't go through with this, that he would make me pay and that I would never see my daughter again.

B.H. said that she lied in her earlier statement about S.H. because "at that point [S.H.] had already gotten into [her] head again," and he had instructed her not to reveal his role in the incident.

B.H. also testified about earlier incidents of physical, sexual, and emotional abuse that S.H. inflicted on her. She described a relationship with S.H. that involved physical violence (she claimed to be beaten about her breasts where bruises would not be visible to others, and choked until she would almost pass out) and sexually violent practices that involved recurrent incidents of rape in various forms (described by one expert who interviewed her as "bizarre" sexual practices). The violence began early in the relationship. B.H. was nineteen years of age when she met S.H. She claimed that the first abusive incident occurred not long thereafter, when the two began to live together. In that encounter, S.H. held an ax to B.H.'s throat and, over an extended period of time, repeatedly raped her and performed other acts of a humiliating nature on her. Other incidents that need not be detailed similarly involved threats, physical violence, and violent sexual practices that B.H. also claimed to have endured from S.H. According to B.H., the abuse continued throughout their relationship, except for a short period of time when S.H. was on medication and in therapy.

Defense counsel informed the trial court that B.H. intended to present a duress defense and that she would rely on the testimony of Dr. Roger Raftery, a licensed psychologist with expertise in forensic psychology. After B.H. had been charged with the offenses involving L.H., Dr. Raftery had been retained by DYFS to evaluate her for the purpose of determining whether she should be allowed to have contact with her children. Following a *Rule* 104 hearing, the trial court authorized limited testimony by Dr. Raftery on battered woman syndrome.[4]

---

4 Dr. Raftery was permitted to inform the jury about the syndrome and, specifically, how it is useful in understanding why an abused woman may

Before the jury, Dr. Raftery testified that battered woman syndrome is used in the defense of criminal conduct to explain why a woman stays in an abusive relationship and why she would continue to live with her abuser. He also stated that the syndrome explains why an abused woman may engage in violent behavior toward her abuser, such as killing or assaulting him. Finally, he opined that "[B.H.] is a battered woman, and [that] she meets what we would know as the so-called criteria for battered woman syndrome."

In rebuttal, the State presented Dr. Timothy J. Michals, a licensed physician specializing in psychiatry and forensic psychiatry. He explained to the jury that battered woman syndrome is not a disease or disorder recognized as a psychiatric diagnosis, but rather is a theory employed in legal contexts to explain the interaction between the batterer and the battered woman. He stated that in his thirty years of practice he was unaware of any circumstance in which a battered woman had assaulted a third party at the direction of her batterer and that the syndrome was not useful in situations in which the woman harms a third person. In his view, it is helpful only in those cases in which an abused woman reacts to her abuser by harming him. Dr. Michals opined that B.H. was not suffering from battered woman syndrome in respect of the incident involving L.H. because: 1) there was a third party victim involved in this crime; 2) B.H. did not mention in her statement to police that she was being battered at the time of the incident; and 3) when interviewed by Dr. Michals, B.H.'s description of what had happened differed from what she had told the police. Moreover, he testified that he could not even form the conclusion that B.H. was a "battered woman" at the time the incident with L.H. occurred.

---

continue to live with a person who was abusing her. However, the trial court held that Dr. Raftery could not opine on whether battered woman syndrome would explain why a battered woman might lie about her abuser in an initial report to police. The defense wanted to introduce such testimony to bolster B.H.'s credibility in respect of her prior inconsistent statement to police officials.

When it was time to instruct the jury on the defense of duress, the trial court identified the following factors from the model charge for the jury to consider: 1) the immediacy of the threat, specifically whether the force or threat of force posed a danger of present, imminent, and impending harm to the defendant or her daughter; 2) the gravity of the harm; 3) the seriousness of the crime that was committed; 4) the age, health, size, and mental and physical condition of both the defendant and the person alleged to have coerced her; 5) the possibility for escape or resistance; and 6) the opportunity for seeking assistance from officials. The dispute in this matter focuses on the following limitation that the court placed on the jury's consideration of the expert testimony on battered woman syndrome. The court stated

> Now, remember, the standard utilized here is that which a person of reasonable firmness in the defendant's situation would have been unable to resist.... [T]he defense of duress is unavailable to a defendant if you find that she recklessly placed herself in a situation that it was probable that she would be subjected to duress.

> \* \* \*

> Now with regard to this issue, that is whether the defendant recklessly placed herself in the situation, I have allowed testimony concerning battered woman syndrome. You may or may not determine that the defendant was afflicted with this condition. That is one of the many factual issues that are solely within your province.

> Should you determine that she was so afflicted, that does not establish that she acted under duress. The sole purpose for which that evidence is offered to you is to explain why the defendant continued to live with her husband and why she hadn't left him. It may be considered, if you find it credible, on the issue of recklessness.

> *The experts' testimony, then regarding battered woman syndrome was not offered to establish that a person of reasonable firmness in the defendant's situation would have been unable to resist, but, rather, to clear up any misconceptions that you may have concerning the activities of battered women, and to understand a battered woman's state of mind.*

> [(Emphasis added).]

B.H. objected to the limitation on the battered woman syndrome evidence. The court declined to adjust its charge and, as noted, the jury convicted B.H. of first-degree aggravated sexual assault (Count One) and third-degree endangering the welfare of a child (as a lesser-included charge on Count Two). She was sentenced

on Count One as if she had been convicted of a second-degree offense, and given a custodial term of seven years. She was sentenced to a concurrent five-year custodial term on Count Two.

In reversing defendant's conviction, the Appellate Division held that the trial court erred when it limited the battered woman syndrome testimony to the question of whether defendant acted recklessly by placing herself in a situation in which it was probable that she would be subjected to duress. *B.H.*, *supra*, 364 *N.J.Super.* at 187, 834 *A.*2d at 1073. *See N.J.S.A.* 2C:2–9b. Specifically, the court stated that in respect of battered woman syndrome evidence the defense of duress was analogous to the justification of self-defense, and that in either setting the jury could consider expert evidence about the syndrome for multiple purposes. *B.H.*, *supra*, 364 *N.J.Super.* at 184, 834 *A.*2d at 1071. Reasoning from *State v. Kelly*, 97 *N.J.* 178, 478 *A.*2d 364 (1984), the panel concluded that, when evaluating a claim of duress, the jury must be permitted to consider the battered woman syndrome evidence in order to understand the nature and extent of the threat posed to the defendant by her batterer, whether the defendant had an honest and reasonable fear, and whether the defendant was able to resist the threat. *B.H.*, *supra*, 364 *N.J.Super.* at 186, 834 *A.*2d at 1072–73. Lastly, the court directed that, on remand, the jury must not be prevented from considering battered woman syndrome evidence when assessing the reasonableness of B.H.'s conduct toward L.H. in response to the alleged coercion. *Ibid.*

II.

A.

As we acknowledged in our decision in *State v. Kelly*, *supra*, 97 *N.J.* at 192–96, 478 *A.*2d at 370–73, "battered woman syndrome" describes a collection of common behavioral and psychological characteristics exhibited in women who repeatedly are physically and emotionally abused over a prolonged length of time by the dominant male figure in their lives. *See generally* Lenore E.A.

Walker, *Battered Women Syndrome and Self–Defense* 6 *Notre Dame J.L. Ethics & Pub. Pol'y* 321, 326–27 (1992). The syndrome has become widely accepted as admissible evidence in self-defense cases because it has been determined to be useful in explaining conduct exhibited by battered women toward their abusers. *Id.* at 328–29. Although "battered woman syndrome" is not a listed psychological "syndrome" in the Diagnostic and Statistical Manual of Mental Disorders, the experience of being battered is mentioned as a potential triggering event for Post Traumatic Stress Disorder (PTSD). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 463–68 (4th ed. text rev. 2000). *See also* Beth I.Z. Boland, *Battered Women Who Act Under Duress,* 28 *New Eng. L. Rev.* 603, 604 n. 5 (1994) (stating that "the syndrome is linked diagnostically with responses to prolonged exposure to various forms of abuse, particularly the experiences of prisoners of war and hostages, where the primary mental impact on the victim is accommodating behavior."). Some have referred to it as a "sub-category" or "subclass" of PTSD. Walker, *supra,* 6 *Notre Dame J.L. Ethics & Pub. Pol'y* at 327; Boland, *supra,* 28 *New Eng. L. Rev.* at 604 n. 5. *See also State v. Riker,* 123 *Wash.*2d 351, 869 *P.*2d 43, 47 (1994).

As social scientists have observed from studies of common experiences of battered women, battered woman syndrome advances our understanding of why a woman remains in an abusive relationship despite being subjected to repeated acts of abuse. Walker, *The Battered Woman Syndrome, supra,* at 330. According to Dr. Walker's thesis, a relationship that is characterized by physical and psychological abuse visited upon the woman by the dominant male figure in her life tends to follow stages (the "cycle of violence") that start with a tension-building phase, followed by an acute battering incident, and then a loving-contrition phase. *Ibid.* After the cycle of violence repeats itself several times, learned helplessness may set in, and the abused woman may become conditioned into believing that she is powerless to escape from the abuse. *Ibid.*

Learned helplessness, often in combination with the social isolation and economic deprivation that typifies the circumstances of such women, results in preventing the battered woman from leaving her abuser. Kelly Grace Monacella, Comment, *Supporting a Defense of Duress: The Admissibility of Battered Woman Syndrome*, 70 *Temp. L. Rev.* 699, 709–11 (1997). Women suffering from battered woman syndrome typically have a poor self-image and low self-esteem. *Id.* at 704. They tend to accept responsibility for the actions of their abusers, and often have psychological problems, including depression. *Ibid.* As we stated in *Kelly*, "[o]nly by understanding these unique pressures that force battered women to remain with their mates, despite their long-standing and reasonable fear of severe bodily harm and the isolation that being a battered woman creates, can a battered woman's state of mind be accurately and fairly understood." *Supra*, 97 *N.J.* at 196, 478 *A.*2d at 372.

## B.

In *Kelly*, we described the characteristics of battered woman syndrome in establishing its use in the context of self-defense. *Ibid.* As noted, to some degree, most jurisdictions accept battered woman syndrome evidence to support a claim of self-defense. *See People v. Romero*, 13 *Cal.Rptr.*2d 332, 337 n. 8 (Ct.App.1993). *See generally* 2 David L. Faigman, et. al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* § 11–1–1.3 (2d ed. 2003).

The New Jersey Penal Code provides that "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *N.J.S.A.* 2C:3–4a. *Kelly* examined the relevancy of battered woman syndrome expert testimony to the state of mind assessment in a self-defense claim. *Id.* at 200, 478 *A.*2d at 375. Because a defendant's credibility is crucial in a claim of self-defense, we found that

[s]pecifically, by showing that [defendant's] experience, although concededly difficult to comprehend, was common to that of other women who had been in similarly

abusive relationships, [*the expert*] *would have helped the jury understand that* [*defendant*] *could have honestly feared that she would suffer serious bodily harm from her husband's attacks, yet still remain with him. This, in turn, would support* [*defendant's*] *testimony about her state of mind (that is, that she honestly feared serious bodily harm) at the time of the* [*incident*].
[*Id.* at 202, 478 A.2d at 375 (emphasis added).]

We stated our expectation that the testimony would clarify and refute myths associated with battered women, and thus, would assist the jury in its determination of the honesty of a defendant's belief that deadly force was necessary to protect herself against her abuser. *Id.* at 206–07, 478 A.2d at 378. *See State v. Gartland,* 149 *N.J.* 456, 472–73, 694 A.2d 564, 572–73 (1997) (reiterating that expert testimony is admissible to help jury overcome common misconceptions about battered women when evaluating defendant's belief about need for deadly force in self-defense); *see also State v. J.Q.,* 130 *N.J.* 554, 580, 617 A.2d 1196, 1210 (1993) (emphasizing circumscribed uses of syndrome evidence).

In the wake of *Kelly,* battered woman syndrome evidence has been admitted to support a claim of self-defense and to assist juries in related credibility determinations by explaining why an abused woman would continue to live with an abuser. *See State v. Townsend,* 374 *N.J.Super.* 25, 53, 863 A.2d 380, 399 (App.Div.) (chronicling use of battered woman syndrome evidence to support credibility of defendant claiming self-defense, as well as to support credibility of female victim), *certif. granted* 183 *N.J.* 218, 871 A.2d 95 (2005); *State v. Ellis,* 280 *N.J.Super.* 533, 545, 656 A.2d 25, 31 (App.Div.1995) (requiring limiting instruction to ensure that jury did not consider battered woman syndrome expert testimony as evidence of abuser's guilt, but rather only for purposes of assessing victim's credibility). In this matter of first impression, we consider its admission and use in criminal trials in respect of the affirmative defense of duress.

## III.

### A.

Originally a common law defense, duress was described by Blackstone as "threats and menaces, which induce a fear of death

or other bodily harm, and which take away for that reason the guilt of many crimes and misdemeanors." 4 W. Blackstone, *Commentaries on the Laws of England* *30. Historically, fear of immediate threat of death or serious bodily harm supported duress as a common law defense. *See State v. Toscano*, 74 *N.J.* 421, 433–34, 378 *A*.2d 755, 761 (1977). In *Toscano*, we discussed the common law principles undergirding duress because, at the time, New Jersey had no statute recognizing duress as a defense to a criminal charge.

> At common law the defense of duress was recognized only when the alleged coercion involved a use or threat of harm which is "present, imminent and pending" and "of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done."
>
> It was commonly said that duress does not excuse the killing of an innocent person even if the accused acted in response to immediate threats. Aside from this exception, however, duress was permitted as a defense to prosecution for a range of serious offenses . . . and many lesser crimes. . . .
>
> To excuse a crime, the threatened injury must induce "such a fear as a man of ordinary fortitude and courage might justly yield to."
>
> [*Id.* at 432–34, 378 *A*.2d at 760–61 (citations omitted).]

The issue in *Toscano* concerned whether it was necessary to allege a present, imminent, and impending danger of harm to claim the excuse of duress. We rejected the common law's rigid requirement of *immediacy* of death or serious injury, *id.* at 436–37, 378 *A*.2d at 762–63, and instead allowed that

> [u]nder some circumstances, the commission of a minor criminal offense should be excusable even if the coercive agent does not use or threaten force which is likely to result in death or "serious" bodily injury. Similarly, it is possible that authorities might not be able to prevent a threat of future harm from eventually being carried out. . . . Warnings of future injury or death will be all the more powerful if the prospective victim is another person, such as a spouse or child, whose safety means more to the threatened person than his own well-being. Finally, as the drafters of the Model Penal Code observed, "long and wasting pressure may break down resistance more effectively than a threat of immediate destruction."
>
> [*Ibid.* (citations omitted).]

As the last comment suggests, it was important to the Court in determining to reject a rigid requirement of "immediacy" that the holding coincide with the approach being taken in respect to duress in the then-proposed New Jersey Penal Code (Code). *Id.*

at 442, 378 A.2d at 765. Justice Pashman engaged in a lengthy discussion of the analytic underpinnings of the pending enactment, *id.* at 437–42, 378 A.2d at 763–65, and framed the Courts holding in terms that followed the language of the proposed Code, modeled after the approach recommended by the American Law Institute in the *Model Penal Code (MPC).* *Id.* at 442, 378 A.2d at 765. *See* American Law Institute *Model Penal Code and Commentaries,* § 2.09 (1985).

*Toscano* foreshadowed many of the concerns expressed in later treatises about the public policies implicated by the recognition of duress as a defense. *See* Joshua Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits,* 62 *S. Cal. L. Rev.* 1331, 1366 (1989) (stating that "[a]t its core, the defense of duress requires us to determine what conduct we, a society of individual members of the human race, may legitimately expect of our fellow threatened humans"). Indeed, the *MPC,* in developing the defense, determined that duress had to be treated differently and kept exceptional because of the moral implications inherent in excusing a defendant who "rationally and intentionally" chooses to commit an unlawful act that may actually include harming an innocent third party. Laura K. Dore, *Downward Adjustment and the Slippery Slope: The Use of Duress in Defense of Battered Offenders,* 56 *Ohio St. L.J.* 665, 747–48 and 747 n. 339 (1995) (recognizing public policy considerations that undergirded determination to "limit the defense to the most serious types of pressures to commit crime"); *see also* Dressler, *supra,* 62 *S. Cal. L. Rev.* at 1367 (noting "line-drawing" nature of duress and that "[a]ll that can be said with certainty is that, assuming the threat remains constant, our willingness to excuse an actor doubtlessly recedes as the offense becomes more heinous" and that only "[s]ome, but not all, persons who are forced into a corner and wrongfully choose to harm innocent persons rather than accept the threatened consequences will be excused").

Subsequent to the *Toscano* decision, the Legislature codified duress as an affirmative defense, "plac[ing] the burden on the

defendant to come forward with some evidence of [duress] and the burden of proof on the State to disprove the affirmative defense beyond a reasonable doubt." *State v. Romano*, 355 *N.J.Super.* 21, 35–36, 809 *A.*2d 158, 167 (App.Div.2002). *N.J.S.A.* 2C:2–9 provides:

> a. Subject to subsection b. of this section, it is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
>
> b. The defense provided by this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was criminally negligent in placing himself in such a situation, whenever criminal negligence suffices to establish culpability for the offense charged. In a prosecution for murder, the defense is only available to reduce the degree of the crime to manslaughter.
>
> c. It is not a defense that a woman acted on the command of her husband, unless she acted under such coercion as would establish a defense under this section. The presumption that a woman, acting in the presence of her husband, is coerced is abolished.

The enactment mirrors the proposal submitted to the Legislature by the New Jersey Criminal Law Revision Commission (Commission), and, as noted, follows identically the language set forth in the *MPC*.[5]

### B.

■ Thus has duress been developed and accepted into the law of our State. In light of the defense's moral underpinnings, however, its use must be carefully circumscribed. Duress is, at its core, a normative defense. *See generally* Dressler, *supra*, 62 *S. Cal. L. Rev.* at 1373; Dore, *supra*, 56 *Ohio St. L.J.* at 741–43. The statute states explicitly the norm that is expected: a defendant is not excused for committing a criminal act affecting an innocent person unless the threat of coercion is sufficient that "a person of

---

[5] The Commission's commentary, as well as published comment on the *MPC*, may, therefore, assist us in our understanding of the Code. *See, e.g., State v. Pena*, 178 *N.J.* 297, 308–12, 839 *A.*2d 870, 876–79 (2004).

reasonable firmness in his situation would have been unable to resist." *N.J.S.A.* 2C:2–9a.

In the commentary that accompanied the Final Report of the Commission, the Commission cites the *MPC* to explain that "[t]he Code rejects the view . . ., expounded by some, that one should look to the actor's ability to withstand the coercion. Instead, it would only allow coercion which 'a person of reasonable firmness in [the defendant's] situation would have been unable to resist.' " II *The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission,* cmt. 3 on 2C:2–9 at 71 (1971) (*Commission Report*).[6] By way of further explanation, the Commentary adds that the "standard established by the Code is not wholly external" in that the defense allows consideration of the defendant's "situation." *Ibid.* The fact finder may "take account of stark, tangible factors which differentiate the actor from another such as his size or strength or age or health—but not [ ] matters of temperament." *Ibid.*

As explained in *Toscano, supra,* the *MPC* drafters considered the conflicting views of commentators on the subject, some suggesting that the defense should be designed to further the criminal law's deterrence function by encouraging persons to act against their self-interest when a substantial percentage of per-

---

[6] In respect of the "person of reasonable firmness" language in the *MPC* duress proposal, we note that the American Law Institute (ALI) studied the duress statutes from the twenty states that had codified the duress defense. *MPC* § 2.09. At that time, the Texas duress statute reviewed by the ALI stated that the threat required to support a duress defense was one that would "intimidate a person of ordinary firmness." *Tex. Penal Code Ann.* § 38 (1948). Prior to the drafting of the *MPC* duress proposal, Texas was the only state to use the term "ordinary firmness." Robert Batey, *Paul Robinson's Criminal Law,* 73 *Notre Dame L. Rev.* 781, 792 n. 106 (1998). Commentators generally have described the "reasonable firmness" language of the MPC provision as embracing an objective standard. 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.7 (2d. 2003). We note that the "ordinary firmness" requirement in the Texas statute also has been applied as an objective standard. *See Cameron v. State,* 925 *S.W.*2d 246, 249–50 (Tex.Ct.App.1995) (observing that duress defense must be objectively reasonable).

sons in similar situations would do so, although detractors were skeptical that such a strict rule would act as a deterrence. 74 *N.J.* at 437–38, 378 *A.*2d at 763. Others "advocated a flexible rule which would allow a jury to consider whether the accused actually lost his capacity to act in accordance with 'his own desire, or motivation, or will' under the pressure of real or imagined forces." *Id.* at 438, 378 *A.*2d at 763. The latter rule would have involved a subjective assessment, "focus[ing] on the weaknesses and strengths of a particular defendant, and his subjective reaction to unlawful demands. Thus, [under that approach,] the 'standard of heroism' of the common law would give way, not to a 'reasonable person' standard, but to a set of expectations based on the defendant's character and situation." *Id.* at 438–39, 378 *A.*2d at 763.

■ Justice Pashman concluded in *Toscano* that "[t]he drafters of the Model Penal Code and the New Jersey Penal Code sought to steer a middle course between these two positions by focusing on whether the standard imposed upon the accused was one with which 'normal members of the community will be *able* to comply. . . .'" *Id.* at 439, 378 *A.*2d at 764. That conclusion is shared by others commenting on the objective nature of the "person of reasonable firmness" standard derived from the Model Penal Code.

> [T]he normative component of duress excuses only those actors who demonstrate the level of fortitude that society can fairly expect of its morally responsible members. The very rationale of duress thus requires that an accused be judged against some objective standard, regardless of her own capacities or constitutional weaknesses. That is, whatever the merits of completely individualizing other excuses, the defense of duress depends on maintaining some objective standard external to the character and capacities of the individual actor.
>
> [Dore, *supra*, 56 *Ohio St. L.J.* at 748–49.]

■ The *Toscano* Court's conclusion draws further support from the Commission Report's discussion that compared the objective standard contemplated for the "person of reasonable firmness" to the objective standard utilized when assessing whether there exists adequate provocation for a passion/provocation defense to murder. The Report explained that "the [proposed]

Code's position is similar to existing law on the provocation formula to reduce murder to manslaughter. See *State v. King*, 37 *N.J.* 285, 181 *A.*2d 158 (1962); *State v. McAllister*, 41 *N.J.* 342, 196 *A.*2d 786 (1964)." *Commission Report*, cmt. 3 on 2C:2–7 at 71. The provocation formula in place at the time of the Commission's Report applied an " 'ordinary man' test as the objective standard [for provocation] against which to measure the subjective fact of passion." *McAllister, supra*, 41 *N.J.* at 353, 196 *A.*2d at 792. We had rejected a subjective test for measuring the effect of an allegedly impassioning event, and instead presupposed an "ordinary" man's reaction to the event, which "contemplates a person without 'serious mental and emotional defects.' " *Id.* at 353–54, 196 *A.*2d at 792. The individual mental and emotional capacities of a person are therefore inapplicable when assessing the objective "adequate provocation" standard. *Ibid. See State v. Robinson*, 136 *N.J.* 476, 491–92, 643 *A.*2d 591, 599 (1994); *see also State v. Mauricio*, 117 *N.J.* 402, 411, 568 *A.*2d 879, 883 (1990) (citing *State v. Grunow*, 102 *N.J.* 133, 140–42, 506 *A.*2d 708, 712–13 (1986) for discussion of legislative rejection of more subjective test for "adequate provocation," and determination to hew to common law objective standard).

▮ Similarly, the Code established a duress defense that measures the sufficiency of a threat of coercion against an objective standard that serves society's interests in carefully circumscribing the defense's use: the person of reasonable firmness. *N.J.S.A.* 2C:2–9a. The idiosyncratic ability of a defendant not to withstand a particular coercive threat does not control. That person's subjective psychological incapacity to resist a coercive threat does not set the bar. Rather, in keeping with the normative function of duress, "[t]he coercive threat must be sufficiently grave and severe as to similarly coerce a non-heroic, but reasonably firm, person into criminal conduct." Dore, *supra*, 56 *Ohio St. L.J.* at 743. Stated otherwise, under duress "the actor should be excused only if he attained or reflected society's legitimate expectations of moral strength." Dressler, *supra*, 62 *S. Cal. L. Rev.* at 1334.

# C.

Under *N.J.S.A.* 2C:2–9a, a successful duress claim must satisfy two distinct components. *See generally* 2 Paul H. Robinson, *Criminal Law Defenses* § 177 (1984). The first is that the defendant must be coerced into the criminal action by the asserted "excusing condition." *Ibid.* The "excusing condition" has been described as subjective because the defendant actually must have been influenced by it. *Ibid.* That assessment necessarily takes into account the defendant's state of mind. The defendant actually must believe in and be frightened by the likelihood of the threatened harm because the defense rests on principles of necessity. *See Commission Report,* cmt. 2 on 2C:2–9 at 70 (stating "[t]he present section gives the principle of necessity application where the evil apprehended comes from another person rather than from the perils of the physical world."). In effect, for duress to be present, "[the] defendant [must] claim[ ] to be psychically incapable of not acting, and therefore excused." *Id.* at 71.[7] Stated conversely, the subjective aspect becomes more apparent— even if a coercive threat may be deemed to be beyond the power of resistance for an ordinary reasonable person, the threat, nonetheless, may be insufficient to coerce the particular defendant and, when that happens, duress is not present for that defendant. *Ibid.* The jury, therefore, must assess the sincerity of the defendant's asserted perception of an imminent threat of harm.

---

[7] The ALI discussion of *MPC* duress mentions brainwashing as a condition possibly supporting a duress defense in cases when an individual's capacity to act of his own volition is so impaired that he will respond, upon mere suggestion, to his controller's wishes. *See MPC* § 2.09. However, the endorsement is incomplete in that it acknowledges that the *MPC* provision, although worded broadly enough arguably to encompass such a circumstance, also has been described as being inapplicable to "purely internal psychic incapacity." *Ibid.* We need not address that supposed application here because nothing has been cited to us to support the contention that battered woman syndrome has been proven to be the equivalent, psychologically, of a complete loss of will, suggesting essentially a lack of *mens rea.*

The second component of the defense is objective in nature: a defendant's level of resistance to the particular threat must meet community standards of reasonableness. The jury must evaluate a defendant's response to the threat by applying the standard of the "person of reasonable firmness." *N.J.S.A.* 2C:2–9a. The norm presupposes an ordinary person without "serious mental and emotional defects." *See McAllister, supra,* 41 *N.J.* at 353–54, 196 *A.*2d at 792; *State v. Van Dyke,* 361 *N.J.Super.* 403, 417, 825 *A.*2d 1163, 1172 (App.Div.) (recognizing duress as establishing standard "measured by the societal objective norm of the person of reasonable firmness rather than by the [particular attributes] which characterize defendant"), *certif. denied,* 178 *N.J.* 35, 834 *A.*2d 407 (2003). It is an objective standard against which to measure the defendant's response to the "threat."

This normative aspect of duress is essential to the defense's coexistence with society's duty to protect innocent third parties from harm. The defense does not excuse easily criminal conduct that could, or does, present harm to innocent persons. "[T]he normative component of duress assures that the coerced actor demonstrated the degree of fortitude expected of a member of the morally responsible community. In other words, even though the legally coerced actor failed to do the right thing, [his or] her act is nevertheless tolerated because [he or] she 'attained society's legitimate expectations of moral strength.'" Dore, *supra,* 56 *Ohio St. L.J.* at 746 (citation omitted).

In making this assessment, the jury must consider objectively such factors as the gravity of the threat, the proximity of the impending harm being threatened, opportunities for escape, likely execution of the threat, and the seriousness of the crime defendant committed. *See Commission Report,* cmt. 3 on 2C:2–9 at 71. A defendant's personal timidity or lack of firmness in the face of intimidation does not serve as the measure for his or her conduct. Community expectations prevail in judging a defendant's response to a threat when that response involves engaging in criminal action toward, or affecting, an innocent third person—

not the one who posed the threat to the defendant. With the defense of duress, a defendant is neither held to a standard of heroism, nor is defendant allowed to rely on his or her idiosyncratic mental and emotional weaknesses.

Finally, before one can even claim to satisfy the components of duress set forth in subsection a of the statute, the defendant must satisfy a threshold requirement set forth in subsection b. The defendant must not have *"recklessly* placed himself [or herself] in a situation in which it was probable that that he [or she] would be subjected to duress." *N.J.S.A.* 2C:2–9b (emphasis added). If the defendant has acted so, the duress defense is unavailable.

IV.

A.

In this case, defendant sought to convince the jury that she had been subjected to coercion sufficient to support a claim of duress by presenting expert testimony about battered woman syndrome. In order to evaluate defendant's proposed use of battered woman syndrome evidence, we consider two questions: is the evidence accepted as reliable for the purposes advanced, and, is the evidence relevant to the statutory defense.

As to the first question, *Evidence Rule* 702 controls. It contains the standards governing the admission of expert testimony and "imposes three basic requirements: '(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.'" *Kemp ex rel. Wright v. State,* 174 *N.J.* 412, 424, 809 *A.2d* 77, 84 (2002) (quoting *Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 413, 605 *A.2d* 1079, 1084 (1992)). Battered woman syndrome expert testimony was scrutinized by those standards in *Kelly. Supra,* 97 *N.J.* at 208, 478 *A.2d* at 379. The expert's testimony about the syndrome was found to meet the

requirements for general acceptance and reliability specifically for the purpose of assisting the jury "to overcome common myths or misconceptions that a woman who had been the victim of battering would have surely left the batterer." *J.Q., supra,* 130 *N.J.* at 574, 617 *A.*2d at 1206.

The relationship between a battered woman and her abuser is complicated and "embodies psychological and societal features that are not well understood by lay observers." *Kelly, supra,* 97 *N.J.* at 209, 478 *A.*2d at 379. There are many stereotypes and myths surrounding that relationship that may influence the jury's ability to evaluate the abused woman's credibility and reasonableness in assessing her state of mind. *Id.* at 204–09, 478 *A.*2d at 377–79. As we determined in *Kelly,* the subject matter is sufficiently "beyond the ken of the average juror," as to make expert witness testimony appropriate on the question of the battered woman's subjective fear and her inability to leave her abuser. *Id.* at 208, 478 *A.*2d at 379. We, therefore, next must consider whether those accepted uses of expert evidence about battered woman syndrome also are relevant in connection with the components of duress in *N.J.S.A.* 2C:2–9a, or to the threshold recklessness assessment that a defendant must vault.

### B.

As noted, *N.J.S.A.* 2C:2–9b requires that

[t]he defense provided by this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress.

*See also N.J.S.A.* 2C:2–9a (rendering subsection a "[s]ubject to subsection b. of this section"). Thus, the defense of duress will fail if the defendant acted recklessly. To allow the jury to assess whether defendant, in fact, was reckless, the trial court admitted the testimony on battered woman syndrome. The court permitted the expert testimony to dispel any commonly held misconception that the jury might have about whether a battered woman should be regarded as having acted recklessly (and thereby be deprived of access to a duress defense) simply because she did not leave the relationship with her abuser. *N.J.S.A.* 2C:2–9b.

■ That demonstration was important to defendant's defense. As the trial court correctly perceived, the testimony was admissible and relevant to the recklessness aspect of the duress defense. *See Kelly, supra,* 97 *N.J.* at 205, 478 *A.*2d at 377. Such expert testimony allows a jury to consider the possibility that a defendant's failure to leave is "part and parcel of her life as a battered [woman]." *Id.* at 206, 478 *A.*2d at 378. Syndrome evidence directly addresses any lay misperception that a defendant is reckless simply because she remained in the abusive relationship by explaining why a battered woman may be unable to leave. We already have found expert testimony about battered woman syndrome useful in explaining why a jury should suspend that commonly held misperception, and have held that such testimony has "sufficient scientific basis to produce uniform and reasonably reliable results" for that purpose in connection with a claim of self-defense against an abuser. *Id.* at 211, 478 *A.*2d at 380. Such testimony is no less reliable when considered in respect of whether the duress defense is unavailable because the defendant has "recklessly placed [her]self in a situation in which it was probable that [s]he would be subjected to duress." *N.J.S.A.* 2C:2–9b. Thus, we agree with the trial court and the Appellate Division that the battered woman's syndrome evidence was admissible and relevant to assist the jury with its assessment of defendant's recklessness.

## C.

■ Assuming we do not have recklessness by the defendant, we turn to the two components of duress required by *N.J.S.A.* 2C:2–9a.

First, there is the requirement that the jury be convinced of the sincerity of a defendant's perception that she is being threatened, that is to say, that she honestly believes that there is an imminent threat of danger. To the extent that the jury must be persuaded that defendant perceived herself to be threatened, expert testimony about battered woman syndrome is also relevant on that question. It was found helpful for a similar state-of-mind purpose

in respect of self-defense and has been used repeatedly in self-defense contexts when a jury must assess the credibility of a defendant claiming fear of perceived imminent danger from her abuser. *See Townsend, supra,* 374 *N.J.Super.* at 53, 863 *A.*2d at 399. As one commentator has explained,

[a] woman who views her circumstances through the eyes of one who has already suffered abuse at the hands of the coercer may see imminent danger even though some time may pass between the threat and her subsequent criminal act, and even though others may see no serious threat at all. There is no reason why the defendant's perception, altered through a cycle of battering, of the imminence of the threat should be any less informative in a case of coerced conduct than where the defendant acted in self-defense. And, in the same way that evidence of past abuse may affect the jury's perception of the defendant's credibility in cases of self-defense, so, too, does it apply in duress cases.

[Boyland, *supra,* 28 *New Eng. L. Rev.* at 625–26 (citations omitted); *see also* Monacella, *supra,* 70 *Temp. L. Rev.* at 725–26.]

Expert testimony can be useful to a jury assessing the sincerity of a defendant's perception of a threat in connection with a duress defense. Our duress statute, by adopting the *MPC* standard that dispensed with an absolute threshold requirement of immediacy, allows the subjective imminence of the threat to the defendant to be but one of several factors to be considered, and thus renders syndrome evidence about the unique perceptions of a battered woman relevant to this subjective aspect of the duress calculus. *See* Dore, *supra,* 56 *Ohio St. L.J.* at 720, 738 (noting overlap between self-defense and duress in respect of use of syndrome evidence to understand defendant's subjective perception of imminent threat).

Battered woman syndrome evidence goes to the heart of that state-of-mind assessment. The jury must decide whether a defendant actually believed that she was under a threat of coercion.

The battered woman defense is clearly relevant to the subjective component of a battered woman's coercion defense. It undeniably aids the woman in bolstering (and in many cases, in salvaging) her credibility before the fact-finder. It supports the honesty of her fear, as well as her belief that committing a crime was the only way to avert harm, even in the absence of an objectively imminent and explicit threat.

[Dore, *supra,* 56 *Ohio St. L.J.* at 761–62.]

In this matter, the trial court's instruction did not inform the jury that the expert testimony could be considered for such purpose,

although at the close of the court's instruction on the battered woman syndrome evidence there was a reference to the testimony being used "to understand a battered woman's state of mind." That fleeting reference, however, came on the heels of the court's direction to the jury that the evidence could only be used for the recklessness assessment and did not give clear direction to the jury.[8]

In sum, in respect of the first component of duress under *N.J.S.A.* 2C:2–9a, we conclude that battered woman syndrome expert evidence is relevant and admissible on the question of the sincerity of defendant's claim that she perceived a threat of harm from S.H. when she engaged in sexual intercourse with her seven-year-old stepson. It was error not to have permitted the jury to hear evidence about battered woman syndrome in connection with that subjective state-of-mind component of defendant's claim of duress. The jury instruction similarly was flawed because the jury was not informed that it could consider battered woman syndrome expert testimony when assessing the sincerity of defendant's perception of a coercive threat.

### D.

 Last, we turn to the second component of duress established by *N.J.S.A.* 2C:2–9a. The ultimate determination for

---

[8] The impact of that instruction was exacerbated by the limitation placed on the extent of Dr. Raftery's testimony. Although defendant did not make a detailed proffer, defendant sought to have Dr. Raftery testify that battered woman syndrome might explain why a battered woman would conceal her abuser's role when reporting her own criminal act to police or other officials. The trial court refused to allow Dr. Raftery's testimony on that subject.

Defendant's defense depended to a large degree on presenting an explanation for her inconsistent renditions of what occurred that July afternoon vis-à-vis S.H.'s role. Indeed, the prosecution claimed she lacked credibility precisely because she did not say that she was threatened by S.H. in her early reports to authorities. The limitation on the expert testimony was pivotal in respect of its relation to questions about credibility. Because battered woman syndrome may help the jury understand questions of credibility about a battered woman, we find the court's evidential ruling unduly restrictive.

the jury is the reasonableness of a defendant's conduct. A jury must be convinced that the defendant experienced a coercion that a person of reasonable firmness in that situation would have been unable to withstand.

Because *N.J.S.A.* 2C:2–9a embodies an objective standard for the evaluation of a defendant's conduct in response to a threat by another, we can discern no place for battered woman syndrome evidence in that assessment. In applying the statute's objective measure, it is a person of reasonable firmness that the jury must consider. The jury must evaluate objectively the defendant's criminal conduct toward a third person, and whether a person of ordinary strength and willpower would refuse to do the criminal act even in the face of the harm threatened. The idiosyncratic fact that the defendant may be susceptible to the demands of her abuser because she suffers from battered woman syndrome becomes irrelevant in that assessment. The issue is whether a person of reasonable firmness in her situation would have been able to resist the threat from her abuser. Expert testimony on the syndrome is inconsistent with the objective standard. Other jurisdictions also have held such evidence not relevant to an objective "person of reasonable firmness" standard, reasoning that the evidence simply explains why a particular defendant would succumb to coercion when a person without a background of being battered would not. *See, e.g., United States v. Willis,* 38 *F.*3d 170, 175 (5th Cir.1994), *cert. denied,* 515 *U.S.* 1145, 115 *S.Ct.* 2585, 132 *L.Ed.*2d 834 (1995); *United States v. Sixty Acres in Etowah County,* 930 *F.*2d 857, 860–61 (11th Cir.1991); *United States v. Smith,* 113 *F.Supp.*2d 879, 909 (E.D.Va.1999).[9]

Commentators similarly have noted the inapplicability of the syndrome evidence to the objective standard.

---

[9] We note that several jurisdictions have found battered woman syndrome evidence to be admissible for certain purposes in respect of a claim of duress. *See, e.g., United States v. Simpson,* 979 *F.*2d 1282, 1287–88 (8th Cir.1992), *cert.*

The battered woman defense, as currently formulated, runs contrary to this normative aspect of duress. .... [T]he battered woman defense typically focuses on how the individual perceptions and psychological capacities of battered women, in fact, differ from those of the person of "reasonable firmness." The more that defense resembles a plea of diminished capacity or insanity, the less the battered offender resembles the morally responsible agent for whom the defense of duress was constructed. In short, the behavioral and psychological characteristics that currently comprise the battered woman defense and that render battered offenders more susceptible to threats and less capable of resistance cannot be imported into the objective standard without gutting duress of its normative function.

[Dore, *supra*, 56 *Ohio St. L.J.* at 743–44 (citations omitted); Monacella, *supra*, 70 *Temple L. Rev.* at 737 (noting that "[a]llowing evidence of battered woman syndrome in duress defenses does not mean that expert testimony may be offered to show that it is understandable that an abused woman believed she was in imminent danger, whereas a reasonable person would not have such a belief").]

As to the second and objective component of the duress defense then, we agree with the trial court. The trial court correctly instructed the jury that the battered woman syndrome evidence was not to be used when it determined whether "a person of reasonable firmness" in the defendant's situation would have been unable to resist.

## V.

We hold that in light of the particular requirements of our statute, courts must apply the standard of a "person of reasonable

denied, *507* U.S. *943, 113* S.Ct. *1345, 122* L.Ed.*2d 727 (1993);* United States v. Marenghi, *893* F.Supp. *85, 92–96 (D.Me.1995),* aff'd, *109* F.3d *28 (1st Cir.1997);* United States v. Brown, *891* F.Supp. *1501, 1508 (D.Kan.1995);* Romero, supra, *13* Cal.Rptr.*2d at 338–39,* rev'd on other grounds, *8* Cal.*4th 728, 35* Cal.Rptr.*2d 270, 883* P.*2d 388 (1994);* State v. Williams, *132* Wash.*2d 248, 937* P.*2d 1052, 1058 (1997).* See also Dunn v. Roberts, *963* F.*2d 308, 313–14 (10th Cir.1992) (holding battered woman syndrome evidence relevant when defendant's intent is disputed);* United States v. Johnson, *956* F.*2d 894, 898 (9th Cir.1992) (considering battered woman syndrome evidence and finding of duress for sentencing, but not liability, purposes);* United States v. Gaviria, *804* F.Supp. *476, 478–79 (E.D.N.Y. 1992) (same);* Arcoren v. United States, *929* F.*2d 1235, 1241 (8th Cir.1991) (concluding battered woman syndrome evidence admissible to bolster credibility of government witness),* cert. denied, *502* U.S., *913, 112* S.Ct. *312, 116* L.Ed.*2d 255 (1991);* Commonwealth v. Conaghan, *433* Mass. *105, 740* N.E.*2d 956, 959– 60 (2000) (finding battered woman syndrome evidence relevant for purposes of competency evaluation).*

firmness" in determining whether duress excuses criminal conduct, and battered woman syndrome expert testimony is not relevant to that analysis. The evidence is relevant, however, to a defendant's subjective perception of a threat from her abuser and, in that respect, can be relevant to her credibility. It also helps in explaining why she would remain with her abuser and, therefore, why such a defendant ought not to be perceived as acting recklessly. In those important latter respects, our decision today permits the syndrome expert testimony to expand a juror's general knowledge about a battered defendant's circumstances. Moreover, if the complete defense of duress is rejected, the syndrome evidence may be relevant in connection with sentencing where it may be applicable to a defendant's mitigation argument under *N.J.S.A.* 2C:44–1b(4).

In this matter, battered woman syndrome expert testimony was admitted at trial, but its content and use inappropriately was restricted. We find too narrow the court's instruction that the expert testimony could be used only for evaluating defendant's recklessness. The court's trailing reference to use of the evidence to understand defendant's "state of mind," although correct, was inadequate to explain to the jury how the evidence may be used to assess the sincerity of defendant's perception of a threat from her alleged abuser. For that reason, we agree with the Appellate Division that defendant's conviction must be reversed. However, to the extent the Appellate Division held further that the evidence may be used to assist the jury in assessing the objective reasonableness of defendant's conduct in response to the purported threat, we disagree and reject that portion of the panel's direction to the trial court on remand.

The jury charge must properly and completely explain how battered woman syndrome evidence may be considered in this matter. The charge here did not fulfill its obligation to be a complete and clear "road map" for the jury. *See State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359, 1366 (1990). For that reason, we are compelled to conclude that defendant's conviction cannot

stand. We cannot treat the shortcoming in the charge as the equivalent of harmless error, particularly in light of the content restriction placed on the testimony of defendant's expert. Defendant's credibility was critical to her defense. Both the State and its expert called her credibility into question precisely because B.H. initially did not describe the coercive role that allegedly was played by S.H. (*i.e.*, that his hand was on her throat as he forced her to engage in the sexual act with L.H.). The limitation imposed on defendant's expert's testimony as it related to questions about defendant's credibility was significant.

## VI.

The judgment of the Appellate Division is affirmed as modified. The matter is remanded for further proceedings consistent with this opinion.

*For affirmance as modified/remand*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.